UNITED STATES of America, Appellee,

v.

**Mario Herbert Gonzalez CARO, Appellant.**

**No. 318, Docket 80–1158.**

United States Court of Appeals, Second Circuit.

Argued Oct. 14, 1980.

Decided Jan. 5, 1981.

---

Edward R. Korman, U. S. Atty., E. D. N. Y., Brooklyn, N. Y. (Vivian Shevitz and Charles E. Rose, Asst. U. S. Attys., Brooklyn, N. Y., of counsel), for appellee.

Daniel H. Murphy, II, Pelham Manor, N. Y., for appellant.

Before FRIENDLY, MANSFIELD and MESKILL, Circuit Judges.

FRIENDLY, Circuit Judge:

Mario Herbert Gonzalez Caro (hereinafter Gonzalez) appeals from a judgment of the District Court for the Eastern District of New York, convicting him after a jury trial of bringing into the United States $10,010 in counterfeit Federal Reserve Notes with intent to defraud and possessing the same notes with intent to defraud, in violation of 18 U.S.C. § 472. He received concurrent sentences on each count of two years imprisonment, of which all but six months was suspended, and was placed on probation for 18 months. He appeals on the grounds that the search of his suitcase, during which the counterfeit was found and seized, violated the Fourth Amendment; that the Government improperly offered evidence of his silence during the search as part of its direct case; and that he was deprived of the effective assistance of counsel at trial.

The facts concerning the search were developed at a pre-trial suppression hearing. Inspector Kowal, who had nine years of experience with the Customs Service, testified that on December 8, 1979, he was assigned to John F. Kennedy International Airport, where he encountered Gonzalez after the latter had deplaned from a flight from South America. After asking a series

of standard questions,[1] Kowal requested that Gonzalez open his suitcase for examination. Kowal's suspicions were aroused because although Gonzalez had stated that he was traveling in connection with his custom jewelry business, the inspector saw nothing in the suitcase that would connect him with that occupation. Kowal reached under the clothing in the suitcase and ran his fingers along the bottom "to check the depth, the hardness of the covers—to see if there were any lumps, irregularities, and so forth." He felt "ridges, as if there were rows of something, and it did not feel as a smooth bottom usually does." He removed the clothing from the suitcase and found that the sides felt heavier and thicker than they ordinarily would. Kowal then conferred with his supervisor, Senior Customs Inspector Kane, who also examined the suitcase and agreed that it felt "lumpy" and "heavier than usual".

Kowal and Kane then took Gonzalez to a private room for a closer examination of the suitcase. After the inspectors confirmed that the baggage tag on Gonzalez' ticket corresponded to the tag on the suitcase, Kane used a knife to puncture a small hole in the lining. Kowal placed his nose within an inch of the hole and smelled fresh glue. The inspectors peeled off the lining at one corner of the suitcase and a layer of cardboard underneath the lining until they saw "white" (presumably the white edge around the counterfeit bills) and then the edge of one of the bills. The inspectors then removed the lining on each side of the suitcase and found four thin rows of what appeared to be Federal Reserve Notes wrapped in plastic and glued to each side of the suitcase. The inspectors determined that the serial numbers on many of the bills were the same. On this record the district judge, although rejecting the Government's argument that the initial puncturing of the lining of Gonzalez' suitcase was valid as a routine border search, denied the motion to suppress on the ground that the puncturing

was reasonable in light of the suspicious circumstances.

With this much established and the counterfeit character of the notes being readily susceptible of proof, the only substantial issue left for trial was whether Gonzalez knew that his suitcase contained the counterfeit.

In his opening statement defense counsel, Mr. Nooter, predicted that the Government would not be able to prove that Gonzalez "knew that he was in possession of the counterfeit currency in the suitcase." Tr. 72. Mr. Nooter then stated that he would prove that his client did not know the counterfeit notes were in the suitcase and would explain how Gonzalez "could have a suitcase without knowing what was in the lining". Tr. 72–73. The Government called Inspector Kowal, who testified substantially as he had at the suppression hearing. His direct examination concluded as follows:

Q: Now, when Inspector Kane began by putting the knife—I think you described—puncturing the small hole with his knife, were you present?

A: Yes, I was.

Q: Was the defendant Mr. Gonzalez present?

A: Yes, he was.

Q: As Inspector Kane was puncturing his suitcase with the knife, did Mr. Gonzalez say anything?

A: No.

Q: As Inspector Kane was cutting the side and peeling back the lining of the suitcase marked as Government's Exhibit 1, did Mr. Gonzalez say anything?

A: No, he didn't. He didn't say a word.

Q: As Inspector Kane and yourself tore out the lining of Government's Exhibit 1, did Mr. Gonzalez say anything?

A: Nothing at all.

Tr. 87–88. Defense counsel made no objection at this time.

---

1. These were asked and answered in English. At the trial defendant was furnished an interpreter. The prosecutor brought out that Gonzalez had answered several questions before the interpreter had had an opportunity to translate them into Spanish. Gonzalez admitted that he had some command of English. Tr. 201.

Later that day, Mr. Nooter moved to strike the portion of Inspector Kowal's testimony quoted above. Tr. 109–110. He moved in the alternative for a curative instruction to the effect that the defendant's silence "should be scrutinized very closely because silence can mean any number of things, either innocence or guilt, and ... has very little probative value". Tr. 110. No mention was made of the privilege against self-incrimination. Judge Sifton did not grant either motion but said that he would permit defense counsel to renew the objection after the latter had researched the pertinent case law. Tr. 114. The following exchange then occurred:

THE COURT: ... Maybe the best thing to do is to cover the whole subject, if it is appropriate to cover it all, either by striking the evidence or cautioning the jury with regard to the use of the—at the time I instruct them on the law—

MR. NOOTER: I think that may be appropriate because it may happen where my client testifies the situation may change as to the admissibility.

When the defendant took the stand near the end of the first day of the trial he denied that he had had any knowledge of the counterfeit notes in the lining of the suitcase. He testified that he had traveled from his home town of Pereira, Colombia, to Cali in order to obtain a visa so that he could return legally to the United States. While in Cali he had encountered Humberto Rios, whom he had known when he lived in Colombia but had not seen in four years. Gonzalez testified that he told Rios he needed a suitcase for his projected journey to the United States. Coincidentally, Rios told him that he had purchased a new Samsonite bag for a similar contemplated journey, for which, unhappily, a visa had been denied. Rios was thus willing to sell Gonzalez the bag, valued at $165 in Colombia, for $50. The difficulty was that the bag was in Medellin, 180 miles from Pereira. According to Gonzalez he traveled eight hours over the Andes from Pereira to Medellin and stayed four days at a hotel in order to buy what he supposed to be an empty Samsonite bag from Rios. After telling this tale the

defendant, toward the end of his direct examination, testified as follows:

Q: Did there come a time when you presented the suitcase to the Customs officer, the inspector?

A: Yes.

Q: And did there come a time when he asked you to go into a different room?

A: Yes, yes.

Q: Did there come a time when he, by removing part of the lining, revealed some money in the lining and the walls of the suitcase?

A: Yes.

Q: And what was your reaction when you saw that money?

A: Well, I was quite shocked, quite.

Q: Did you say anything?

A: Well, I asked him to bring me an interpreter because I didn't speak much English, that it was very strange to me that something should have happened with the suitcase, and that I wanted to cooperate.

Q: Did they bring an interpreter?

A: Yes, yes.

Q: When the interpreter came, did you say anything to them about the suitcase?

A: Yes.

Q: What did you say?

A: That I wanted them to investigate this very well because that was not mine, that I did recognize the clothing but that that was not mine.

Q: Not mine what?

A: What they showed me there, the columns of—

Q: Did you ever say that you thought it was not your suitcase?

A: Well, I got very frightened, and yes, that I didn't know where this case from [sic] and I might have.

Tr. 173–75. The supposed interpreter was not called.

At the end of the first day of the trial, Judge Sifton asked defense counsel whether

he intended to pursue his objection to Inspector Kowal's testimony, suggesting that any objection seemed to him inconsistent with Mr. Nooter's having elicited testimony from the defendant concerning his reaction to his suitcase being searched. Tr. 190. Mr. Nooter replied that he would like to think about it overnight, observing that "[t]here is the sense in which my having gone into it was called upon by virtue of what the Government did." Tr. 190–91. Judge Sifton responded that "if you had that in mind you should have said something about it . . . before the defendant testified." Mr. Nooter agreed. Tr. 191. When the trial resumed the next morning, defense counsel withdrew his motion to strike Inspector Kowal's testimony concerning the defendant's silence. Tr. 196.

At the close of the evidence, the prosecution and defense each gave a summation and the prosecution also made a rebuttal statement. The first reference to defendant's silence came in defense counsel's remarks:

> Maybe if he was guilty he would have stood on his rights to remain silent and so forth, but what Mr. Gonzalez did was—he was shocked. His jaw dropped. He turned pale and he was shocked.

Tr. 243. In rebuttal the prosecutor responded as follows:

> What would an honest person have done; in fact, what would any of you have done when you saw a customs inspector take out his trusty pocket knife and start to bore a hole into your suitcase if you didn't know that there was a reason for him boring a hole? What would be the reaction of a person who had no idea that there was something hidden in the suitcase? As Inspector Kane opened up the suitcase to start to punch a hole in the lining, you heard what Mr. Gonzalez' reaction was from Inspector Kowal, he stood there silently, and as they caught a small corner of it and started to peel it back, Mr. Gonzalez stood there silently. As they took the bottom out of his suitcase, Mr. Gonzalez stood there silently. Is that the action of a person who has no

idea that there is something in the suitcase; or would an honest innocent person look at Inspector Kane and Inspector Kowal? Be it Spanish or English, I suggest to you that the commotion of puncturing that hole needs no translation; or would he not say to that Customs Inspector: "Excuse me. What are you doing with my suitcase? Why are you doing that? That is my suitcase. My clothes are in it. I brought it here and now you are cutting it open. What are you doing?" No, Mr. Gonzalez stood there silently. That is because, ladies and gentlemen, Mr. Gonzalez knew what was in that suitcase; and when Mr. Nooter says, "His jaw dropped . . ."; that "he turned pale"; indeed, he did because he knew he was caught. There was nothing orally he could say. The only thing he could say is, "That's not my bag." When the numbers matched, he realized he couldn't do that, so the only other thing he could say was, "Well, I didn't know it was in there."

Tr. 258–59.

## DISCUSSION

■ Little need be said with respect to Gonzalez' objections to the search and seizure. While we do not understand why the district court did not accept the Government's argument that the search was valid as a routine border search under our recent decision in *United States v. Nieves*, 609 F.2d 642, 645–46 (2 Cir. 1979), *cert. denied sub nom. Figueroa v. United States*, 444 U.S. 1085, 100 S.Ct. 1044, 62 L.Ed.2d 771 (1980), we need not say much about this since the search and seizure were valid even under a stricter test. Once the customs inspector felt unusual ridges along the sides of the suitcase and observed that the sides were unusually thick and heavy, he was entitled to find out what accounted for this. The inspectors had even more reason for suspicion than did the inspectors in *Nieves*, and puncturing a small hole in the lining was no more intrusive than requiring Nieves to remove his shoes and boring holes through their inner soles. As Judge Waterman wrote in *Nieves, supra*, 609 F.2d at 645:

Of necessity, the law governing the inspection of travellers crossing our national boundaries is responsive to a different set of imperatives from those that guide law enforcement officers in their investigative contacts with persons who are already within this country. It long has been established that routine border searches, conducted for the purpose of controlling the movement of people and goods across our national boundaries, do not violate the Fourth Amendment's prohibition against unreasonable searches. Once the hole disclosed the presence of fresh glue, the inspectors were justified in making a thorough search even if this required the cutting of parts of the suitcase.

Even if the actions of the inspectors are to be judged by a more stringent standard, the result is the same. The opening of the suitcase and a cursory examination, surely permissible as a routine border search, revealed that it contained no goods associated with the business in which Gonzalez claimed to be engaged, that unusual ridges were present along the sides and that the latter were heavier and thicker than they should be. These circumstances created the basis for a reasonable suspicion and thus justified making the small hole. The smell of fresh glue in turn suggested the probability that something out of the ordinary had been placed within the linings; the inspectors were entitled to find out what it was. When the removal of the lining disclosed the presence of what appeared to be Federal Reserve Notes, the inspectors were entitled to pursue the inquiry to the end.

The testimony elicited by the prosecution concerning Gonzalez' failure to protest the violence done to his suitcase presents a more substantial issue. Since one thing the self-incrimination clause clearly prohibits is forcing a criminal defendant to take the stand, it was not a great advance to hold, as the Court did in *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), although over sharp dissent, see also *Tehan v. United States ex rel. Shott*, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966), that a prosecutor may not comment on a defendant's failure to testify in his own defense.[2] The debate on that subject has mainly concerned how far the prosecution can go in arguing that its case, or some portion of it, is uncontradicted before such an argument becomes a comment on the defendant's failure to testify. See, e. g., *U.S. ex rel. Leak v. Follette*, 418 F.2d 1266, 1269–70 (2 Cir. 1969), *cert. denied*, 397 U.S. 1050, 90 S.Ct. 1388, 25 L.Ed.2d 665 (1970), and cases there cited. Because the privilege against self-incrimination is less clearly applicable before formal criminal proceedings have been initiated, and indeed was understood until relatively recently to exclude confessions at an earlier stage only when these were specifically shown to be involuntary, see *Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 186–187, 42 L.Ed. 568 (1897), and generally Friendly, The Fifth Amendment Tomorrow: The Case for Constitutional Change, 37 U.Cin.L. Rev. 671, 708–16 (1968), prosecutorial use of evidence of a defendant's pretrial silence raises a more difficult question. That question must of course be considered in light of the Court's pronouncement in *Miranda v. Arizona*, 384 U.S. 436, 90 S.Ct. 140, 24 L.Ed.2d 122 (1966), that the privilege bars admission of statements made by a suspect in custody unless the police have administered the warnings prescribed in that decision and have secured a waiver of the suspect's right to remain silent.

■ It is established that when a suspect remains silent after receiving *Miranda* warnings, his silence cannot be used against him at trial even to impeach his exculpatory testimony on the ground that he did not present the same explanation to the police upon his arrest, much less as evidence in the Government's case in chief. *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975) (supervisory power); *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (due process). Two slightly different considerations have been

---

2. This had long been the federal rule by virtue of 18 U.S.C. § 3481 and it predecessors, as read in *Wilson v. United States*, 149 U.S. 60, 13 S.Ct. 765, 37 L.Ed. 650 (1893).

adduced to support this prohibition. One is that silence following *Miranda* warnings is "insolubly ambiguous" since it may be nothing more than an exercise of the rights described by the warnings. *Id.* at 617, 96 S.Ct. at 2244. The other is that the warnings convey an implicit assurance to a suspect that his silence will not be used against him. *Id.* at 618, 96 S.Ct. at 2245. The latter reasoning was the basis of Justice White's concurring opinion in *United States v. Hale,* 422 U.S. at 182, 95 S.Ct. 2133, 45 L.Ed.2d 99.

■ It is equally clear, however, that evidence of silence following arrest and *Miranda* warnings can be used "to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest. Cf. *United States v. Fairchild,* 505 F.2d 1378, 1383 (CA5 1973)." *Doyle v. Ohio, supra,* 426 U.S. at 619 n.11, 96 S.Ct. at 2245 n.11. To the same effect is our own decision in *United States v. Vega,* 589 F.2d 1147, 1151–52 (2 Cir. 1978). As applied to this case, if the Government had awaited Gonzalez' testimony that he had called for an interpreter and expressed the desire that the presence of the Notes in the suitcase be carefully investigated, Kowal could have been recalled to give the testimony here at issue and also to testify, if such was the fact, that Gonzalez had done nothing of the sort claimed.

In its decision last Term in *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the Supreme Court held that, where no *Miranda* warnings have been given and it is clear that the circumstances did not require them, neither due process nor the privilege against self-incrimination forbids impeachment of a defendant's exculpatory testimony on the basis of his silence prior to arrest. Specifically, the Court ruled that the testimony of the defendant in that case that he had killed the deceased in self-defense was properly

impeached by evidence that he did not report the killing to the police until two weeks after it occurred. In his opinion for the Court, Justice Powell found the due process principle of *Doyle v. Ohio, supra,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 inapplicable because "no governmental action induced petitioner to remain silent", 100 S.Ct. at 2130. He concluded that Jenkins' privilege against self-incrimination had not been violated because *Raffel v. United States,* 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926), permits impeachment based on a prior assertion of the privilege and thus "clearly permits impeachment [based on prearrest silence] even if the prearrest silence were held to be an invocation of the Fifth Amendment right to remain silent". 100 S.Ct. at 2128 n.2. The Court implicitly rejected the notion of an unqualified pre-arrest "right of silence", see dissenting opinion of Justice Marshall, joined by Justice Brennan, 100 S.Ct. at 2133–2137, when it allowed prosecutorial comment on the exercise of that "right" if the defendant elects to testify. Mr. Justice Stevens, joined by Mr. Justice Stewart, went further and asserted that the privilege against self-incrimination "is simply irrelevant to a citizen's decision to remain silent when he is under no official compulsion to speak." *Id.,* 100 S.Ct. at 2130 (footnote omitted). He added that:

> The fact that a citizen has a constitutional right to remain silent when he is questioned has no bearing on the probative significance of his silence before he has any contact with the police. We need not hold that every citizen has a duty to report every infraction of law that he witnesses in order to justify the drawing of a reasonable inference from silence in a situation in which the ordinary citizen would normally speak out. When a citizen is under no official compulsion whatever, either to speak or to remain silent, I see no reason why his voluntary decision to do one or the other should raise any issue under the Fifth Amendment. For in determining whether the privilege is applicable, the question is whether petitioner was in a position to have his testi-

mony compelled and then asserted his privilege, not simply whether he was silent.

*Id.* 100 S.Ct. at 2132, 4697 *(footnotes omitted).*

Whatever the future impact of *Jenkins* may be, we have found no decision permitting the use of silence, even the silence of a suspect who has been given no *Miranda* warnings and is entitled to none, as part of the Government's direct case. While *Jenkins* may require a reexamination of lower court decisions extending *United States v. Hale, supra,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 and *Doyle v. Ohio, supra,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 to the silence of a suspect who has been taken into custody but has not received *Miranda* warnings, see *United States v. Impson,* 531 F.2d 274, 277 (5 Cir. 1976); *Bradford v. Stone,* 594 F.2d 1294, 1295 (9 Cir. 1979); *United States v. Nunez-Rios,* 622 F.2d 1093, 1101 (2 Cir. 1980); *People v. Conyers,* 49 N.Y.2d 174, 424 N.Y.S.2d 402, 406–07, 400 N.E.2d 342 (4–3) (1980),[3] we are not confident that *Jenkins* permits even evidence that a suspect remained silent before he was arrested or taken into custody to be used in the Government's case in chief. We will thus assume, without deciding, that even if we were to hold that Gonzalez was not in custody during the ripping apart of his suitcase, see *United States v. Hall,* 421 F.2d 540, 545 (2 Cir. 1969), *cert. denied,* 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970); *United States v. Henry,* 604 F.2d 908 (5 Cir. 1979); contrast *United States v. De La Cruz,* 420 F.2d 1093 (7 Cir. 1970); *United States v. Salinas,* 439 F.2d 376 (5 Cir. 1971), this would not necessarily carry the day for the prosecution in light of the fact that all of the cases permitting proof of silence, including *Jenkins,* have involved impeachment or rebuttal of the defendant's testimony.

■ However, even if we thus assume *arguendo* that it was error for the Government to introduce evidence of Gonzalez' silence when it did, the error was harmless beyond a reasonable doubt because the evidence could subsequently have been introduced to rebut Gonzalez' testimony that he was shocked to see the counterfeit notes found in his suitcase. See *Doyle v. Ohio, supra,* 426 U.S. at 619 n.11, 96 S.Ct. at 2245 n.11, *United States v. Vega, supra,* 589 F.2d at 1151–52. Defense counsel himself recognized that the admissibility of the evidence in question would be affected by the defendant's testimony, and having deliberately chosen to present Gonzalez' version of his reaction to the discovery of the counterfeit and to rely on Gonzalez' testimony in his summation, he could hardly expect to prevent the jury from considering the Government's evidence to the contrary. See *Bradford v. Stone, supra,* 594 F.2d at 1296. Mr. Nooter in any event withdrew his motion concerning Inspector Kowal's testimony, thus leaving nothing upon which the judge could rule. Although we may "notice errors to which no exception has been taken ... if they ... seriously affect the fairness, integrity or public reputation of judicial proceedings", *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936), we will not consider a claim of error where " 'counsel consciously and intentionally failed to save the point and led the trial judge to understand that counsel was satisfied.' " *Johnson v. United States,* 318 U.S. 189, 200, 63 S.Ct. 549, 554, 87 L.Ed. 555 (1943) (quoting *United States v. Manton,* 107 F.2d 834, 848 (2 Cir. 1938)).

■ Gonzalez' final claim, that Mr. Nooter's handling of this issue was such as to deprive him of the effective assistance of counsel, is unpersuasive. As our discussion has shown, the question of how far pre-arrest silence may be used against a defendant is not set out in black letter law. Moreover, Mr. Nooter clearly was obliged to call Gonzalez as a matter of trial tactics if the latter was to have any chance to avoid conviction, and this would have made Inspector Kowal's testimony admissible. If

---

**3.** It is of interest that the only one of these cases decided after *Jenkins, People v. Conyers,* on which we relied in *Nunez-Rios,* was vacated and remanded by the Court for reconsideration in light of *Jenkins,* 447 U.S. ——, 101 S.Ct. 56, 66 L.Ed.2d 12.

there was any error in judgment in not objecting to the admission of Kowal's testimony as part of the Government's case, its adverse effect was negligible in the face of the Government's overwhelming evidence against Gonzalez. For the rest Mr. Nooter seems to have done the best that could have been done with a hopeless case. See *United States v. Katz*, 425 F.2d 928, 930 (2 Cir. 1970); *United States ex rel. Crispin v. Mancusi*, 448 F.2d 233, 234 (2 Cir.), *cert. denied*, 404 U.S. 967, 92 S.Ct. 346, 30 L.Ed.2d 288 (1971); *United States ex rel. Marcelin v. Mancusi*, 462 F.2d 36, 43 & n.2 (2 Cir. 1972), *cert. denied*, 410 U.S. 917, 93 S.Ct. 977, 35 L.Ed.2d 279 (1973); *United States v. Aulet*, 618 F.2d 182, 188 (2 Cir. 1980).

Affirmed.