**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Frederick M. BLANTON,
Defendant-Appellant.**

No. 82–5309.

United States Court of Appeals,
Eleventh Circuit.

April 30, 1984.

Rehearing Denied June 11, 1984.

Jon H. Gutmacher, Fort Lauderdale, Fla., for defendant-appellant.

Stanley Marcus, U.S. Atty., Thomas A. Blair, Linda Collins Hertz, Jon May, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before RONEY, HATCHETT and ANDERSON, Circuit Judges.

RONEY, Circuit Judge:

A jury convicted Frederick Marsh Blanton, a medical doctor specializing in ophthamology, on three counts of distributing methaqualone (quaaludes), a controlled substance in violation of 21 U.S.C.A. § 841(a)(1), one count of acquiring a controlled substance by fraud, misrepresentation, and deception in violation of 21 U.S.C.A. § 843(a)(3), and one count of failing to keep accurate records of controlled substances dispensed in violation of 21 U.S.C.A. § 842(a)(5). Blanton raises a number of issues on appeal: misconstruction of the governing statute by the district court; sufficiency of the evidence; various evidentiary rulings; and violation of his fifth amendment privilege against self-incrimination. We affirm.

A brief review of the federal statutory scheme embodied in the Controlled Substances Act, 21 U.S.C.A. § 801 et seq.,[1] which regulates the means by which medical doctors may acquire and dispense controlled substances is necessary to an understanding of defendant's contentions.

In passing the Controlled Substances Act, "Congress was particularly concerned with the diversion of drugs from legitimate channels to illegitimate channels." *United States v. Moore*, 423 U.S. 122, 135, 96 S.Ct. 335, 342, 46 L.Ed.2d 333 (1975). The Act attempts to limit this diversion by strict registration requirements for all persons,

---

1. This footnote contains a more detailed summary of the Controlled Substances Act.

 To possess or dispense a controlled substance, doctors must be licensed to practice medicine and register annually with the Drug Enforcement Administration (DEA). 21 U.S.C.A. § 822. Doctors may acquire and dispense controlled substances "to the extent authorized by their registration." *Id.* § 822(b). The registration application contains a separate box denoting each schedule and directs applicants to check each box which is applicable in registering for desired schedules. The statute mandates that the DEA register physicians in every schedule they check if the physicians are authorized by state law to dispense the substances included in that schedule. *Id.* § 823(f).

 Physicians and other registrants must obtain controlled substances from pharmaceutical supply houses on forms prescribed and supplied by the DEA. *Id.* § 828. These preprinted forms show a registrant's name, address, and the schedules for which he is registered. *Id.* § 828(d)(1). The forms have three parts. 21 C.F.R. §§ 1305.05, 1305.06. When a registrant orders a controlled substance, he fills in the order form, sending the first two copies to the supply house and keeping the third copy as his own record of what he ordered. The supply house keeps the first copy for its records and forwards the second copy to the DEA. *Id.* § 1305.09. The testimony at trial showed the agency maintains routine computerized surveillance of all the forms it receives to determine whether registrants order unusually large amounts of controlled substances or have unusual buying patterns. Such cases are referred to compliance investigators for further scrutiny.

 A physician may apply for registration either to dispense or to conduct research with different requirements for narcotics and non-narcotics. *Id.* § 1301.22. A doctor registered to dispense a narcotic substance must register separately to conduct research using that substance. *Id.* § 1301.22(a)(6). A practitioner who is registered to dispense a non-narcotic substance, however, may also conduct research using that substance without a separate registration. *Id.* § 1301.22(b)(6). The drug here involved, methaqualone, is a non-narcotic substance.

 Recordkeeping is required of physicians who dispense controlled substances. 21 U.S.C.A. § 827(a)(3). The recordkeeping requirements are not applicable, however, to registered physicians who dispense non-narcotic controlled substances without charge. *Id.* § 827(c)(1)(B); 21 C.F.R. § 1304.03(c).

including physicians, who are authorized by state law to handle controlled substances. The registration scheme includes formalized drug ordering procedures and certain types of recordkeeping thus allowing the federal government's Drug Enforcement Administration (DEA) to closely monitor the flow of controlled substances from manufacturer to the hands of the consumer. To simplify the DEA's task, controlled substances are divided into categories or schedules. The schedules are numbered I through V with I including the most dangerous drugs and V the least dangerous. Schedule II N is the schedule for methaqualone. Doctors must register for the schedules they wish to dispense or use in research and order drugs in those schedules on DEA promulgated forms. Subject to certain exceptions, physicians must keep records of the drugs they dispense or use in research. Failure to comply can be a criminal violation.

### Defendant's Status

In March, 1976, Blanton was first contacted by the DEA. At that time, he was registered to handle substances in Schedules II through V, including Schedule II N. The DEA had become concerned because of the unusually large quantities of methaqualone defendant had been purchasing. DEA Investigator Chaves conducted an audit of defendant's methaqualone supply, and found that he had 63,500 tablets on hand. When questioned about why he needed so much methaqualone, defendant said he was doing research. He failed to produce any satisfactory records of that research. Investigator Chaves explained what type of records must be maintained by researchers. Defendant promised to comply.

When Blanton renewed his DEA registration for 1976–77 in July of 1976, he omitted Schedule II N, which was the methaqualone schedule, and all less dangerous drug schedules from his registration application, checking only the box for Schedule II narcotic substances. Despite his failure to register for Schedule II N on his 1976–77 DEA registration, Blanton continued to order large quantities of methaqualone. As a result, he received a visit from Investigator Chaves in October of 1976. Chaves informed defendant that he was not registered to handle methaqualone, and requested that he immediately register in Schedule II N. Defendant disregarded Chaves's instructions but continued ordering methaqualone. Between November 19, 1976 and October 10, 1977, defendant purchased 294,000 methaqualone tablets from pharmaceutical houses.

When defendant renewed his DEA registration for the year 1977–78, he again omitted Schedule II N from his registration application. This prompted a third visit from Investigator Chaves on October 7, 1977. Defendant told Chaves that his failure to register for Schedule II N was a "clerical error." Chaves explained to defendant the procedure for registering and cautioned him not to dispose of the methaqualone then in his possession.

An audit of defendant's methaqualone supply five weeks later revealed 92,000 tablets. At that time, Chaves again warned defendant not to dispose of the methaqualone because he was not properly registered. A subsequent search of his medical files revealed no record of how defendant disposed of the almost 300,000 tablets he had procured over the previous year and a half.

On December 5, 1977, defendant called William Lenck, who was then an executive assistant to the Administrator of the DEA. In a rambling conversation with Lenck, defendant said that he had not checked all the blocks on his registration application because "it would reveal information concerning research projects that he did not want to be revealed." Defendant also disclosed that 3,000 persons were involved in his present project. This conflicted with a statement he had made earlier to a DEA attorney, when he claimed to have between fourteen and thirty thousand persons in his project.

Shortly thereafter, defendant was observed emptying the safe deposit boxes

where he stored his supply of methaqualone. Defendant was promptly arrested. Only 16,500 out of the 92,000 tablets noted in the latest audit were found by the police.

### Section 841(a) Violations

Defendant disputes his conviction on three counts of dispensing methaqualone in violation of 21 U.S.C.A. § 841(a)(1), the general criminal provision of the Controlled Substances Act, on the ground that the trial judge improperly charged the jury that he could be convicted for simply not complying with the technicalities of the registration requirement. The primary issue is whether a physician who dispenses a controlled substance in knowing violation of the Controlled Substances Act's registration requirement can be convicted under 21 U.S.C.A. § 841(a)(1) without proof that the drugs were dispensed outside the bounds of professional practice. Defendant correctly asserts that under the charge given by the trial court he could have been convicted of a section 841(a)(1) violation by simply willfully not registering for methaqualone but dispensing it anyway[2]. Contrary to defendant's argument, however, this correctly states the law.

In pertinent part, section 841(a)(1) reads: "except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or possess with intent to manufacture, distribute, or dispense, a controlled substance...." Section 822(b) defines what activities are authorized by the subchapter and by implication fills out the "except as authorized by this subchapter" part of section 841.

> *Persons* registered by the Attorney General under this subchapter to manufacture, distribute, or dispense controlled substances *are authorized* to possess, manufacture, distribute, or dispense such substances ... to *the extent authorized by their registration....*

21 U.S.C.A. § 822(b) (emphasis added). Thus, under the plain language of the statute, a person who is not registered by the Attorney General for a given substance is not authorized to dispense it and thus is not excepted from prosecution under section 841.

Defendant attempts to avoid this conclusion by arguing that section 841 was designed to criminalize the activities of drug pushers and not registrants who technically violate the registration provisions of the Act. Defendant contends that "technical" violations involving registration can only be prosecuted under 21 U.S.C.A. §§ 842[3] and

---

**2.** The trial judge charged the jury that the defendant could be found guilty of a section 841(a) violation if the following three elements were met:

 a. That the defendant was not registered to possess, distribute or dispense Methaqualone.

 or

If you find that he was registered to possess, distribute and dispense Methaqualone, that he possessed, distributed or dispensed it (as the case may be) other than in the course of professional practice and other than for a legitimate medical purpose.

 b. That the defendant possessed Methaqualone with the intent to distribute or dispense it (Count I).

 or

That the defendant distributed or dispensed Methaqualone (Count II and III).

 c. That he did so knowingly and willfully.

 . . . . .

The word "willfully," means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law.

**3.** *Section 842(a)*

(a) It shall be unlawful for any person—

(1) who is subject to the requirements of part C to distribute or dispense a controlled substance in violation of section 829 of this title;

(2) who is a registrant to distribute or dispense a controlled substance not authorized by his registration to another registrant or other authorized person or to manufacture a controlled substance not authorized by his registration;

(3) who is a registrant to distribute a controlled substance in violation of section 825 of this title;

(4) to remove, alter, or obliterate a symbol or label required by section 825 of this title;

(5) to refuse or fail to make, keep, or furnish any record, report, notification, declaration, order or order form, statement, invoice, or information required under this subchapter or subchapter II of this chapter;

§ 843 [4]. To support this argument, defendant cites *United States v. Moore*, 423 U.S. 122, 96 S.Ct. 335, 46 L.Ed.2d 333 (1975). Although some of the language in *Moore* appears to buttress defendant's position, the case is of limited relevance because of its different factual setting. *Moore* involved the question of whether a physician could ever be prosecuted under section 841(a)(1) for dispensing drugs *for which he was registered*. The Supreme Court held that a physician could violate section 841 even when acting pursuant to his registration if he exceeded the usual course of professional practice, only the lawful acts of registrants being exempted. *Moore* does not, however, support the argument that a physician not registered to dispense the drugs he is dispensing could not be prosecuted if his activity would be within the usual course of professional practice, if he had been registered. Defendant clearly falls within the statutory prohibition and not the exception because he was not registered to dispense methaqualone.

In the alternative, defendant argues that he was registered for methaqualone because registration in Schedule II automatically registered him for all less dangerous drug schedules, including those covered by Schedule II N.

■ The "concept of 'registration'" is the heart of the statute. *United States v. Moore*, 423 U.S. at 140, 96 S.Ct. at 344. Registration circumscribes the authority to dispense controlled substances. Section 822(b) allows practitioners to dispense controlled substances only "to the extent authorized by their registration". The statute is sufficiently clear to prevent an interpretation that physicians can dispense drugs for which they are not registered. Defendant notes that under section 823(f) federal registration follows automatically if a physician is permitted to dispense controlled substances under state law. From this, he argues actual registration is unnecessary. Section 823(f), however, does not circumvent the registration requirement. The section merely provides automatic approval for state-licensed physicians who actually register. It does not act as registration for dispensation of drugs for which the physician is not registered.

### *Sufficiency of Evidence*

■ Viewing the evidence in light most favorable to the Government, we conclude

(6) to refuse any entry into any premises or inspection authorized by this subchapter or subchapter II of this chapter;

(7) to remove, break, injure, or deface a seal placed upon controlled substances pursuant to section 824(f) or 881 of this title or to remove or dispose of substances so placed under seal;

(8) to use, to his own advantage, or to reveal, other than to duly authorized officers or employees of the United States, or to the courts when relevant in any judicial proceeding under this subchapter or subchapter II of this chapter, any information acquired in the course of an inspection authorized by this subchapter concerning any method or process which as a trade secret is entitled to protection; or

(9) to distribute or sell piperidine in violation of regulations established under section 830(a)(2) of this title, respecting presentation of identification.

**4.** *Section 843(a)*

(a) It shall be unlawful for any person knowingly or intentionally—

(1) who is a registrant to distribute a controlled substance classified in schedule I or II, in the course of his legitimate business, except pursuant to an order or an order form as required by section 828 of this title;

(2) to use in the course of the manufacture or distribution of a controlled substance a registration number which is fictitious, revoked, suspended, or issued to another person;

(3) to acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge;

(4)(A) to furnish false or fraudulent material information in, or omit any material information from, any application, report, record, or other document required to be made, kept, or filed under this subchapter or subchapter II of this chapter, or (B) to present false or fraudulent identification where the person is receiving or purchasing piperidine and the person is required to present identification under section 830(a) of this title; or

(5) to make, distribute, or possess any punch, die, plate, stone, or other thing designed to print, imprint, or reproduce the trademark, trade name, or other identifying mark, imprint, or device of another or any likeness of any of the foregoing upon any drug or container or labeling thereof so as to render such drug a counterfeit substance.

that a reasonable trier of fact could find the evidence established that defendant was guilty beyond a reasonable doubt. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B) (en banc), *aff'd on other grounds*, —— U.S. ——, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

The judge charged that defendant could be convicted if they found either that (1) he dispensed methaqualone knowing he was not registered for that drug, or (2) if they concluded he was registered, that he dispensed methaqualone for other than a legitimate medical purpose.

As to the first alternative, defendant argues that even if his theory of automatic registration is incorrect, his was at most a technical violation of the registration requirement because he believed he was registered. The evidence defeats this argument. Defendant was registered to dispense controlled substances in Schedules II through V, including II N, until July 31, 1976. When he renewed his registration for 1976–77, he checked only the box on the registration form for Schedule II drugs, even though the form clearly directs applicants to check "all applicable boxes" to denote each schedule for which they wish to be registered. Although a DEA agent informed him in October 1976 that he was not registered for methaqualone, he continued to order and dispense the drug. Defendant claimed to have sent a letter to the DEA requesting that his registration be amended, but he had no copy of it and the DEA never received it. Despite all of the foregoing, when defendant renewed his 1977–78 registration, he again omitted Schedule II N from his registration. Coupling this evidence with the evidence that defendant attempted to remove his remaining supply of the drug from safe deposit boxes at three banks despite DEA orders to leave the drugs intact, the jury could reasonably conclude that defendant ordered more and more methaqualone knowing he was not licensed to do so.

As to the second alternative, defendant contends no evidence was adduced to prove illegitimate drug transactions. The record reveals otherwise. The evidence showed that over a period of a year and a half defendant dispensed almost 300,000 methaqualone tablets. At one point during this period, defendant told the DEA that between fourteen thousand and thirty thousand people were involved in his experiment. Despite the massive scale of his project, defendant did not produce any reports documenting any aspect of his "research." While in March 1976 he did show a DEA agent 39 folders and some computer printed numbers purporting to represent case histories and patients involved in his project, he could never match any folder or computer number with any patient record in his office. He introduced no records of his research project at trial, relying solely on his own testimony. An inspection of his patient records for the pertinent time period disclosed that only four out of four thousand contained notations that the patient had received methaqualone, and one of those was a nine-year-old child. Even assuming that defendant was not required by statute to keep records, the jury was certainly free to infer that no legitimate researcher would fail to record the results of his experiments.

*Evidentiary Rulings*

Defendant contends the trial court allowed the Government to introduce evidence of collateral offenses and bad acts in violation of Fed.R.Evid. 404(b) and wrongfully excluded certain exculpatory evidence. The collateral offenses occurred at the time of defendant's arrest and were testified to by the arresting officer. The bad acts were brought out during the Government's cross-examination of the defendant. The contentions regarding collateral offenses and bad acts are perhaps the most troubling issues on appeal. Counsel prepared a helpful chart graphing these issues both individually and cumulatively. Careful review, however, brings us to the conclusion that no reversible error occurred.

The collateral offenses which were testified to at trial occurred under the following circumstances. At the DEA's request, Scotti, a city police officer, went to Blanton's home on February 24, 1978 to seize methaqualone which Blanton had removed from various safe deposit boxes. Scotti testified that when he arrived at Blanton's home defendant came outside carrying a shotgun and ordered Scotti and his partner off the property. They drove about a block away and saw Blanton emerge from the house a second time, remove a green duffel bag from his car and place it in a van. Scotti testified that Blanton had what looked like a .45 caliber pistol in a holster. The officers moved in, arrested Blanton, and seized the bag from the van. When asked if he noticed anything unusual about the defendant at that time, Scotti testified Blanton had a bag of marijuana sticking out of his pocket and appeared to be intoxicated although he could detect no odor of alcohol.

■ Defendant did not object to the testimony about the .45 caliber pistol or that defendant appeared to be intoxicated. We hold the admission of this evidence did not amount to plain error. The testimony regarding the shotgun and the bag of marijuana did not fall within the prohibition of Rule 404(b). Defendant was charged with possessing and distributing methaqualone other than for a legitimate medical purpose and outside the usual course of his medical practice. The transactions occurring at the time defendant was arrested were part of the *res gestae* of the offense. *United States v. Kloock*, 652 F.2d 492, 494–95 (5th Cir.1981); *United States v. Killian*, 639 F.2d 206, 211 (5th Cir.), *cert. denied*, 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981).

■ The bad acts evidence was brought forth in certain portions of the Government's cross-examination of Blanton. The most troublesome colloquy between the prosecutor and the defendant is set out below:

Q. Has anyone that you ever treated died of an overdose?

A. Never, sir.

Q. Are you sure about that, doctor?

A. To the best—yes, I am sure.

Q. How did your wife die?

A. My wife died of an—accidental combination of overdose of Seconal plus a piece of frankfurter being lodged in her trachea. That is the windpipe, sir.

Q. Did you purchase and supply to her the Seconal that she overdosed with?

A. Yes, I did, sir.

Blanton's attorney immediately asked to approach the bench and moved for a mistrial on the ground that the evidence was irrelevant and prejudicial. To the contrary, the evidence was relevant to the attitude defendant displayed towards the substances he dispensed. Defendant repeatedly sought to establish that he was involved in legitimate research using methaqualone. Immediately prior to the quoted exchange, defendant testified that he would have known if anyone involved in his research project had ever overdosed and "[i]f they messed up, they were off the project." Throughout his testimony, defendant portrayed himself as being meticulously careful when dispensing controlled substances. Having inserted this issue into the trial, Blanton cannot now complain about the Government's effort to show the opposite, that he cavalierly acquired and dispensed controlled substances.

■ A similar conclusion must be drawn on the Government's elicitation from defendant on cross-examination that he performed marijuana experiments without proper authorization; that he procured marijuana for these experiments "off the street;" that he had smoked marijuana; and that his experiments resulted in his forced resignation from two local hospitals. Over the Government's objection, defendant testified at length on direct examination about experiments he conducted which involved giving marijuana brownies to persons suffering from glaucoma. Copies of articles by defendant detailing the results of these experiments were admitted into

evidence. Presumably this evidence was designed to show that defendant was a legitimate medical researcher. Again, the Government's cross-examination was proper impeachment well within the scope of defendant's direct examination.

 The exculpatory evidence which defendant claims was wrongfully excluded involved registration statements obtained by the defendant subsequent to the date of the charged offenses. The trial court excluded Blanton's 1981 DEA registration for all schedules. That defendant was registered in 1981 was not relevant to the issue of whether he was registered to dispense II N substances from October 7, 1976 to March 3, 1978, the period covered by the indictment. Contrary to defendant's argument the 1981 registration did not demonstrate DEA's bias or undermine the credibility of the Government's witnesses. There was no abuse of discretion in the exclusion of this evidence.

### Fifth Amendment Issue

Defendant claims his fifth amendment privilege against self-incrimination was violated by testimony about his pre-arrest silence. During the prosecution's case in chief, a DEA agent testified about an administrative inspection on November 15, 1977, of Dr. Blanton's safe deposit boxes conducted to inventory the methaqualone defendant kept in the boxes. The agent testified that Blanton answered "yes" when asked if the 92,000 pills found in the boxes constituted his entire supply of quaaludes. The agent, based on copies of purchase orders the DEA had received from pharmaceutical companies, believed Blanton had ordered more than 92,000 pills. The prosecutor then asked, and the agent answered, as follows:

Q. Did you question Dr. Blanton concerning what he had done with the rest of the quaaludes?

A. We began to get into that conversation and then Dr. Blanton just did not want to say any more about it and that was the end of that conver-

sation or any conversation discussing that particular aspect.

The issue is whether the prosecution may allude in its case in chief to a defendant's pre-arrest silence in response to governmental questioning, where defendant subsequently takes the stand and testifies. The evidence would have been admissible in rebuttal, if the defendant took the stand and claimed to have told an exculpatory story to the authorities. *Doyle v. Ohio,* 426 U.S. 610, 619 n. 11, 96 S.Ct. 2240, 2245 n. 11, 49 L.Ed.2d 91 (1976). Blanton did not so testify. We have found only one case involving similar circumstances to the case at bar. In *United States v. Caro,* 637 F.2d 869 (2d Cir.1981), the prosecutor elicited testimony from a customs agent that the defendant had not said anything during the search of a suitcase. The court stated it had "found no decision permitting the use of silence, even the silence of a suspect who has been given no *Miranda* warnings and is entitled to none, as part of the Government's direct case." *Id.* at 876. The court further noted that all of the cases which allowed evidence regarding a defendant's silence, including *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), have involved impeachment or rebuttal of the defendant's testimony. The *Caro* court ultimately held the error harmless because the evidence could have been used to rebut the defendant's testimony that he was shocked to see the contraband in his suitcase and defendant withdrew his objection to the testimony. 637 F.2d at 876.

 In a case involving a comment on the defendant's failure to testify at trial, the Supreme Court has recently admonished appellate courts to dutifully "consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations." *United States v. Hasting,* —— U.S. ——, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). The Court stated the dispositive question is whether, absent the prosecutor's allusion, it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilt. In Blanton's

case, it seems clear beyond doubt that, absent the question and answer regarding Blanton's statement that he did not want to say any more about what he had done with the pills, the verdict would have been the same. The evidence of guilt was overwhelming. Blanton's statement was never again referred to by anyone. There is no indication that Blanton took the stand solely because of this evidence introduced in the Government's opening case. The error, if error at all, was harmless beyond a reasonable doubt.

### Section 843(a)(3) Violations

Count 4 of the indictment charged that defendant intentionally obtained approximately 308,000 units of methaqualone by misrepresentation, fraud, or deception by ordering the Schedule II N substance knowing he was registered for only Schedule II drugs in violation of § 843(a)(3). Defendant claims he could not have deceived DEA because the order forms he used clearly showed he was registered to handle only Schedule II substances. He also reasserts his contentions that registration for Schedule II N was superfluous because he was registered in Schedule II. Finally, he claims even if registration was necessary his actions were at most technical, as opposed to knowing, violations of the statute. The "automatic registration" and "technical" violator arguments have been dealt with above. The other argument is meritless as well. The jury could find that ordering a Schedule II N drug on a form which only authorizes the ordering of Schedule II drugs constitutes deceit and subterfuge. In fact, this was exactly defendant's plan as revealed in his phone call to DEA Administrator William Lenck.

### Section 842(a)(5) Violation

■ There is no statutory support for defendant's contention that he was not required to keep research records and thus did not violate section 842(a)(5). Although he is correct that 21 U.S.C.A. § 827(c)(1)(B) and 21 C.F.R. § 1304.03(c) (1982) exempt doctors from record-keeping requirements when they dispense non-narcotic substances without charge, the exemptions apply only to those doctors who are otherwise properly registered to dispense such substances. Defendant was not properly registered.

Finally, defendant's contentions regarding the jury instructions on recordkeeping merit no discussion. Viewed as a whole, the charge fairly presented the law to the jury.

AFFIRMED.