STATE of Utah, Plaintiff and Appellee,

v.

Curtis PALMER, Defendant and Appellant.

No. 930192–CA.

Court of Appeals of Utah.

July 22, 1993.

340

Elizabeth Holbrook, Salt Lake City, for appellant.

Jan Graham and Kris Leonard, Salt Lake City, for appellee.

Before BILLINGS, JACKSON and RUSSON, JJ.

## OPINION

BILLINGS, Presiding Judge:

Defendant, Curtis Palmer, appeals his conviction of aggravated sexual abuse of a child, a first degree felony in violation of Utah Code Ann. § 76–5–404.1 (1990). We reverse.

## FACTS

Defendant lived with his mother at 520 East Commonwealth Avenue in Salt Lake County.[1] He met Chuck Bartholomew while both men were incarcerated at the Utah State Prison. After their release, the men maintained a friendship. Sometime in early 1990, Bartholomew introduced defendant to his stepson, nine year old E.N. Between the end of school in 1990 and December of 1990, E.N. visited defendant numerous times to return borrowed items, to work at defendant's home, or to stay while his parents were gone. Additionally, E.N. once spent the night at defendant's house when E.N.'s sister and some friends were staying at E.N.'s house.

At age five, E.N. had been sexually abused by his natural father. E.N. was removed from his mother's home for a time when he was eight years old for molesting his little sister. E.N. had participated in counseling as a result of these experiences.

On January 7, 1991, E.N.'s mother was walking him and his sisters to school. Because children had teased E.N. previously, he did not want to go to school and threw a tantrum. E.N.'s mother told him she was going to call defendant. The record is unclear as to her motivation for calling defendant. It was either to help calm E.N. down

or to have defendant take E.N. to Bartholomew to be punished, or both. E.N. then accused defendant of sexually abusing him. E.N.'s mother took him home and after further questioning called the police.

The case was assigned to Salt Lake City Police Detective Dennis Sweat. On January 11, 1992, the detective left a message on defendant's answering machine. After receiving the message, defendant attempted to phone Bartholomew but reached E.N.'s mother and talked to her instead. On January 14, 1992, and again two days later, defendant contacted Detective Sweat by phone and discussed the situation. According to Detective Sweat, defendant suggested making a deal for community service stating "he never once claimed it didn't happen" and "he wanted to get some advice" before talking. The Salt Lake County Attorney filed an information. The information alleged defendant had committed the crime of "[a]ggravated sexual abuse of a child, a first degree felony, at 520 East Commonwealth, in Salt Lake County, State of Utah." Defendant surrendered and was arrested. The preliminary hearing was held March 28, 1992, at which time defendant was bound over for trial.

At trial, E.N. testified defendant had touched his penis and buttocks "about seven" different times at defendant's house between the end of school in 1990 and December of 1990, forced him to touch defendant's penis once, and tried to force him to kiss defendant's lips. E.N. further testified the last time defendant touched him was at a hot tub rental business. Additionally, E.N. alleged defendant had asked him to touch defendant several times. E.N. also testified defendant had warned E.N. his mother and stepfather would get in trouble if E.N. told anyone about the incidents.

The trial court allowed a "Stipulation of Expected Testimony" of Detective Sweat regarding defendant's prearrest conversations with him to be read into evidence.

---

1. On appeal we recite the facts from the record in the manner most consistent with the jury's verdict. *State v. Verde,* 770 P.2d 116, 117 (Utah 1989); *State v. Ellifritz,* 835 P.2d 170, 172 n. 1 (Utah App.1992).

The jury convicted defendant of sexual abuse of a child. Because he had previously been convicted for attempted sexual abuse of a child, this conviction was enhanced to a first degree felony pursuant to Utah Code Ann. § 76-5-404.1(3)(e) (1990).

Defendant raises numerous claims on appeal. We do not discuss all the issues,[2] but rather focus on the numerous issues which require our reversal of defendant's conviction.

## I. PROSECUTORIAL MISCONDUCT

■■■ Defendant points to a number of instances of prosecutorial misconduct. He argues the prosecutor, both in his cross examination of defendant and his closing arguments, made improper statements. The State responds that defendant failed to preserve all but one issue for appeal and the preserved issue did not amount to prosecutorial misconduct.

Generally, the test used for determining whether a prosecutor's statements are improper and constitute error is whether the remarks " 'called to the jurors' attention matters which they would not be justified in considering in reaching a verdict.' " Improper statements will require reversal if they are determined to be harmful.

*State v. Emmett,* 839 P.2d 781, 785 (Utah 1992) (quoting *State v. Johnson,* 663 P.2d 48, 51 (Utah 1983) (quoting *State v. Creviston,* 646 P.2d 750, 754 (Utah 1982))) (footnote omitted). Failure to object to the improper remarks, however, waives the claim unless the remarks reach the level of plain error. *Id.* Normally, we find plain error only if we conclude: an error exists, it should have been obvious to the trial court, and it was harmful. *State v. Dunn,* 850 P.2d 1201, 1208 (Utah 1993); *see also State v. Verde,* 770 P.2d 116, 121 n. 10; *State v. Ellifritz,* 835 P.2d 170, 174 (Utah App.

1992). *But see State v. Eldredge,* 773 P.2d 29, 35 n. 8 (Utah) (noting "obviousness requirement poses no rigid and insurmountable barrier to review"), *cert denied, Eldredge v. Utah,* 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 29 (1989). An error is harmful if it undermines our confidence in the verdict or, put another way, there is a reasonable likelihood of a more favorable outcome without the error. *Dunn,* 850 P.2d at 1208-09; *Ellifritz,* 835 P.2d at 174.

### A. Unsupported Innuendo

First, defendant claims the prosecutor failed to support prejudicial, inculpatory inferences arising from his questions with appropriate evidence. During cross-examination of defendant the following exchange occurred:

Q. [Prosecutor] You really liked [E.N.], didn't you?

A. [Defendant] Yes.

Q. You admitted as much to his stepfather, didn't you?

A. Yes. I mean, I had a friendship with the stepfather and with [E.N.].

Q. And didn't you, at one time, say to the stepfather, "Yes, I'm having feelings for [E.N.] that I really shouldn't be having?"

A. I don't know whether I made [a] statement to that effect.

Q. That certainly would have been an accurate statement wouldn't it?

A. I mean, I was close to [E.N.]. But if you're talking about sexual feelings, no.

Q. You deny you ever had sexual feelings toward this young boy?

A. Yes.

After further questions on different topics, the prosecutor asked:

Isn't it true that you in fact, on previous occasions, had told [E.N.'s stepfather]

---

**2.** Defendant's claims that we have examined but do not address are: (1) The trial court erred when it referred to the charge as one of aggravated assault; (2) Evidence of the hot tub incident is inadmissible "other bad act" evidence; (3) The elements jury instruction contained a fatal variance from the information; (4) The prosecutor improperly violated the trial court's bifurcation order; (5) The prosecutor's reference to E.N.'s molestation of his sisters rather than just one sister and to the magistrate's determination at the preliminary hearing were prosecutorial misconduct; and (6) Utah Rule of Evidence 408 or 410 made admission of portions of the stipulation of Detective Sweat's testimony improper.

that you were concerned about feelings that you were having for E.N. that were inappropriate?

To which defendant answered "no."

■ The prosecution did not put on evidence that defendant made such an incriminating statement to E.N.'s stepfather. Defendant claims the failure to introduce supporting evidence means the question brought improper information to the jurors' attention. The State responds that under the plain error test any error embodied in the exchange was neither obvious nor harmful.

■ The Utah Supreme Court, in dicta, recently noted this type of questioning is generally error. *See State v. Emmett,* 839 P.2d 781 (Utah 1992). In *Emmett,* after ruling the defendant was entitled to a new trial, the court addressed some issues which it felt might be presented on retrial. One of those issues was the propriety of the prosecutor's questioning. Referring to the defendant's pretrial witness preparation, "the prosecutor asked, 'He didn't tell you to face the jury and *tell you exactly what to say?'*" *Id.* at 786 (emphasis in original). The defendant denied the allegation and no evidence was entered which supported it. The court noted: "Generally, it is error to ask an accused a question that implies the existence of a prejudicial fact unless the prosecution can prove the existence of the fact. Otherwise, the only limit on such a line of questioning would be the prosecutor's imagination." *Id.* at 786–87. *See also United States v. Silverstein,* 737 F.2d 864, 868 (10th Cir.1984) (requiring prosecutor who asks accused question implying existence of prejudicial fact to prove the fact); *State v. Peterson,* 722 P.2d 768, 769–70 (Utah 1986) (per curiam) (holding questioning about prior convictions after witness's denial improper without extrinsic proof of convictions). Hence, we conclude the prosecutor's questions which implied inculpatory facts that were unsupported by evidence were error.

The next question is whether the error is obvious. The trial judge could not know whether later evidence would support the inculpatory inferences of the prosecutor's

questions. Thus, we cannot say the error was obvious. However, this is a circumstance "when an error not readily apparent to the court" does not raise an "insurmountable barrier to review." *State v. Eldredge,* 773 P.2d 29, 35 n. 8 (Utah 1989). In this case, the egregious nature of the prosecutor's question and the strong inculpatory inferences contained therein lead us "to dispense with the requirement of obviousness so that justice can be done." *Id.* Unless we apply this exception, this type of error would always escape review under the obviousness requirement.

We reserve an analysis of the harmfulness of this error in order to consider it in conjunction with all other errors in the case. *See Emmett,* 839 P.2d at 786 (assessing harmfulness after considering all errors).

### B. Examination on the Veracity of Other Witnesses

■ While cross-examining defendant, the prosecutor asked him to comment on the conflict between his testimony and that of two other witnesses, E.N. and his mother. The prosecutor asked defendant if E.N. was "mistaken or lying" regarding the visit to the hot tub establishment. Defendant answered "yes." Later, while discussing defendant's phone conversations with Detective Sweat, the prosecutor again had defendant comment on E.N.'s veracity.

Q. [Prosecutor] You knew that whatever [E.N.] had to say regarding sexual abuse, it was not true, as applied to you?

A. [Defendant] That's correct.

Q. Had you by that time formulated any reason that you could think of that [E.N.] would say these things about you if they weren't true?

A. Oh, I—

Q. Just yes or no.

A. Not really.

Q. Did you think about it?

A. I was kind of in shock.

The prosecutor later asked if E.N.'s mother was "mistaken or lying" regarding a conversation she testified about. Defen-

dant again answered in the affirmative. Defendant argues these questions regarding the veracity of the other witnesses amount to prosecutorial misconduct. The State responds they must be analyzed for plain error.

In the dicta portion of *Emmett*, the supreme court addressed the propriety of examination on another witness's veracity. The court noted this type of

> question is improper because it is argumentative and seeks information beyond the witness's competence. The prejudicial effect of such a question lies in the fact that it suggests to the jury that a witness is committing perjury even though there are other explanations for the inconsistency. In addition, it puts the defendant in the untenable position of commenting on the character and motivations of another witness who may appear sympathetic to the jury.

*Emmett*, 839 P.2d at 787 (footnote omitted).

Thus, we conclude these questions amounted to obvious error. We again reserve an analysis of the harmfulness of this error so we can consider it in conjunction with all other errors in the case.

### C. Argument on Matters Not in Evidence

■ Defendant identifies three comments by the prosecutor in closing argument on matters not in evidence. A comment by a prosecutor during closing argument that the jury consider matters outside the evidence is prosecutorial misconduct. *See State v. Troy*, 688 P.2d 483, 486 (Utah 1984). Again, defendant's counsel failed to object to these comments and we can only reach them under a plain error analysis. In two of the instances we address, the State argues only that any error was harmless, thus conceding both error and obviousness. Regarding the other remark, the State argues the failure to object was an affirmative trial strategy of defense counsel and thus plain error analysis is precluded. We need not decide whether these misstatements of the evidence should have been obvious to the trial judge. We are hesitant to set a rule which would require a trial judge to intervene in closing argument whenever the judge believes a misstatement of the evidence by counsel has occurred. Whether or not objections to such misstatements are to be made is trial counsel's decision. In the vast majority of instances, failure to object to such a misstatement will be deemed a waiver of the error. However, the three misstatements we address went to the heart of the State's case and, especially in light of the pattern of errors in this case, we are compelled to assess their impact. Thus, even if the misstatements were not "obvious," we would "dispense with the obviousness requirement so that justice can be done." *State v. Eldredge*, 773 P.2d 29, 35 n. 8 (Utah 1989).

■ First, in closing argument the prosecutor stated:

> It [a minor inconsistency in E.N.'s testimony] shows only that he's capable of having the same failure of memory that we all are, but the central core of his memory is unaffected. This man touched him, touched him on the penis. He did it while he was naked, while he was sitting in his lap.

There was no evidence of any abusive touching while E.N. was sitting on defendant's lap. The harmfulness of this single comment on the alleged lapsitting incident is considered in conjunction with the other errors in the case.

■ Second, in the final portion of his closing remarks the prosecutor referred to the hot tub incident. Defendant's counsel attempted to attack E.N.'s credibility during the defense's closing argument. Trying to reduce the impact of that attack, the prosecutor discussed the hot tub incident.

> I don't care about the hot tub. It was kind of interesting, as discombobulated as it was, that [defendant] wasn't prepared with his slicko testimony to talk about the hot tub. But he did admit that he had been to the hot tub before, on more than one occasion. He did admit that, yes, you can't get kids in there unless you have got an adult with them. And if memory serves correctly, he told

us where the hot tub was, even though he couldn't agree or couldn't confirm, or whatever you want to use, with my suggestion about what the possible name of it was.

I think the Court can take judicial notice of the fact there's such a place as Rub–A–Dub Hot Tub. If memory serves correctly, it's on about 21st South and Ninth East. It's not where [E.N] said it was. That he wasn't to the hot tub. But it's where [defendant] says he went to the hot tub. It's the same place that [E.N.] said he went.

E.N. testified that defendant had taken him to a hot tub business on South State Street. He could not remember the name of it. Defendant testified he had been to a hot tub business but denied ever taking E.N. there. He admitted "going by" Rub–A–Dub Hot Tub.

Defendant contends there is no evidence connecting E.N. with Rub–A–Dub Hot Tub. Further, there is no testimony regarding the business's address. Thus, the prosecutor's statement the court could take judicial notice of the hot tub business and his argument this business was where defendant took E.N. could well have convinced the jury the hot tub evidence was stronger than it actually was. Defendant notes these comments came in the prosecutor's final closing remarks to which defendant had no opportunity to respond.

The State concedes the prosecutor's statement is "not entirely accurate" but contends defendant was not harmed by the error. Whether the prosecutor's improper statements regarding Rub–A–Dub Hot Tub are harmful will be considered in conjunction with the other errors in this case.

■ Third, the prosecutor told the jury: "We know that when he talked to [E.N.'s mother], he somehow figured out that he was worried about seven different counts." The prosecutor then focused on this fact as supporting both E.N.'s testimony and the State's theory that defendant was unusually sophisticated regarding these charges. The prosecutor argued defendant's knowledge evidenced a consciousness of guilt. However, there was no testimony from

E.N.'s mother that defendant ever mentioned seven charges. In fact, defendant testified he learned of the potential for seven charges from Detective Sweat, to whom he talked after he talked to E.N.'s mother. Further, defendant expressly denied ever mentioning the potential for seven charges to E.N.'s mother. Thus, the prosecutor not only argued facts not in evidence but argued facts directly contradictory to the evidence.

The State argues that because defendant's counsel used this contradiction as an example of problems with the State's case, he made an affirmative decision not to object to the prosecutor's comments. Thus, according to the State, we should not undertake a plain error analysis of these comments. See *State v. Bullock*, 791 P.2d 155 (Utah 1989) (holding strategic decision by counsel to allow evidence precludes plain error analysis). We disagree. We find the prosecutor's comments error and consider any harm from this error in conjunction with the other errors.

## II. PRE–MIRANDA CONVERSATION WITH DETECTIVE SWEAT

Detective Sweat had a conflict at the time of trial and was not called to testify. In place of his live testimony there was a document read into the record captioned "Stipulation of Expected Testimony." Prior to the stipulation being read, an informal conference was held where the judge deleted some portions of the stipulation objected to by defendant. The judge however refused to delete other portions of the stipulation objected to by defendant.

The portion of the stipulation relevant to our analysis that the trial judge allowed over defendant's objection provides:

Mr. Palmer told me he would call back after he decided whether he wanted to talk to me in person or not.

. . . .

Mr. Palmer then said he had never once claimed that it didn't happen, he just wanted to get some advice before talking to me.

Prior to admission of this stipulated testimony, defendant's counsel indicated he had objected to it in the informal conference held by the trial judge in part because the statements included evidence of defendant "trying to decide whether or not [he] ought to have counsel in this case." [3] The prosecutor indicated he thought the contested portions were admissible because

> [t]hat's the theory of the State's case that this shows a consciousness of guilt.... The detective [told defendant] he wanted to discuss some allegations of [E.N.] that [defendant] had sexually abused him.
>
> ... [G]iven the specificity of that and the fact that [defendant] is the one who initiated the telephone call, I think it ought to be allowed for the purpose of showing consciousness of guilt.

Following the introduction of Detective Sweat's testimony in the case in chief, defendant took the stand. He testified that in the first phone conversation he had informed Detective Sweat he wanted to check with legal counsel. According to defendant, Detective Sweat responded to the effect "if you're not guilty, why do you need a lawyer?" Defendant testified he told Detective Sweat that he was neither admitting nor denying anything. He further testified his reason for not denying everything was that he wanted a chance to talk to a lawyer first.

The prosecutor argued that defendant's choice to remain silent and neither admit nor deny guilt to Detective Sweat showed a consciousness of guilt. Discussing defendant's refusal to admit or deny the charges in his closing argument, the prosecutor stated:

> What kind of a person would do that? I mean, he's not working for the CIA. He's not one of these public officials who have been instructed to tell the newsman, "I can neither confirm nor deny such and such a rumor." He's a person who has been accused of a crime.
>
> Now, what is so incredibly difficult about saying, "No, I didn't do it?" Why didn't he do that? Because he knew he was guilty, that's why.

Defendant claims admission of the contested paragraphs of the stipulation to support an inference of guilt was unconstitutional. Defendant asserts he has a right, under the Fifth Amendment to the United States Constitution, to not have his decision to seek advice and neither admit nor deny the charges against him placed in evidence in the prosecution's case in chief to prove culpability.[4] The State responds that the contested paragraphs do not implicate the Fifth Amendment.

The Fifth Amendment provides: "No person shall ... be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.[5] Utah courts have

---

**3.** The fact that these evidentiary rulings and arguments were made in an informal conference makes assessment of this issue much more difficult than it would be if the conference was part of the record. We have, however, a summary made by counsel for both sides on the record and we make our determination based on that oral summary. As we have recognized before, "a record should be made of *all* proceedings of courts of record" including those in chambers. *Birch v. Birch*, 771 P.2d 1114, 1116 (Utah App.1989) (citing *Briggs v. Holcomb*, 740 P.2d 281, 283 (Utah App.1987)) (emphasis in original).

**4.** In a footnote, defendant refers to Article I sections 7 and 12 of the Utah Constitution and invites us to apply a state constitutional analysis to this question. This argument, however, is not developed to any meaningful extent. We therefore refuse to consider it. *See State v. Arroyo*, 770 P.2d 153, 154 n. 1 (Utah App.1989),

*rev'd. on other grounds,* 796 P.2d 684 (Utah 1990).

**5.** The Fifth Amendment privilege against self incrimination is based on numerous social policies.

> It reflects many of our fundamental values and most nobel aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice, our fear that self-incriminating statements will be elicited by inhumane treatments and abuses; our sense of fair play which dictates "a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load;" our respect for the

never explicitly addressed whether evidence of a person exercising the constitutional right to remain silent or to consult with an attorney prior to custodial interrogation can be used as inferential evidence of guilt during the State's case in chief.[6] Furthermore, the United States Supreme Court has not directly considered the issue raised by defendant. The Supreme Court has noted the seminal Fifth Amendment silence case, *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its predecessor *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), are not innovations but are merely "explication[s] of basic rights that are enshrined in our Constitution." *Miranda*, 384 U.S. at 442, 86 S.Ct. at 1611. The Fifth Amendment right to silence is a comprehensive privilege that

> "can be claimed in any proceeding, be it criminal or civil, administrative or judicial, *investigatory* or adjudicatory.... [I]t protects any disclosures which the witness may reasonably apprehend could be used in a criminal prosecution or which could lead to other evidence that might be so used."

*In re Gault*, 387 U.S. 1, 47–48, 87 S.Ct. 1428, 1454, 18 L.Ed.2d 527 (1967) (quoting *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 94, 84 S.Ct. 1594, 1611, 12 L.Ed.2d 678 (1964) (White, J., concurring)) (emphasis modified).

The Supreme Court has held that comment by a prosecutor on a defendant's failure to testify at trial is an unconstitutional violation of the defendant's Fifth Amendment rights. *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965). Further, the Court has ruled a defendant's silence cannot be used to impeach his testimony at trial if his silence follows the delivery of *Miranda* warnings. In *Doyle v. Ohio*, 426 U.S. 610,

> inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life;" our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes "a shelter to the guilty," is often "a protection to the innocent."

96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the Supreme Court held a prosecutor's attempt to impeach a defendant's testimony by questioning him about his silence following arrest and receipt of *Miranda* warnings violated due process. *Id.* 426 U.S. at 619, 96 S.Ct. at 2245. The Court reasoned that this silence follows the delivery of *Miranda* warnings and could simply be an exercise of these rights. "Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested." *Id.* 426 U.S. at 617, 96 S.Ct. at 2244.

Even the three dissenters in *Doyle* found "merit in a portion" of petitioner's argument. *Id.* at 620, 96 S.Ct. at 2246 (Stevens, J., dissenting). In discussing the aspect they found meritorious, they indicate using silence as a direct inference of guilt is improper. "Comment on the lack of credibility of the defendant is plainly proper; it is not proper, however, for the prosecutor to ask the jury to draw a direct inference of guilt from silence—to argue, in effect, that silence is inconsistent with innocence." *Id.* at 634–35, 96 S.Ct. at 2252–53 (Stevens, J., dissenting). Because the permissible credibility reference and the impermissible inference of guilt reference by the prosecutor were "inextricably intertwined," the dissenters rejected reversing the conviction due to the inference of guilt argument. *Id.* at 636, 96 S.Ct. at 2253 (Stevens, J., dissenting). Thus, while rejecting the Court's holding that post-*Miranda* silence was inadmissible for impeachment purposes, the dissent implies evidence of silence is inadmissible in the case in chief.

Later, in *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the Court held a defendant's prearrest, pre-*Miranda* warnings silence could be used to impeach his exculpatory testimony at trial.[7]

*Murphy v. Waterfront Comm'n*, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596–97, 12 L.Ed.2d 678 (1964) (citations omitted).

6. *See State v. Gray*, 851 P.2d 1217, 1223–24 (Utah App.1993) (assessing passing reference to silence under custodial interrogation standard).

7. The *Jenkins* Court expressly reserved the issue of whether prearrest silence was ever protected

*Id.* 447 U.S. at 240, 100 S.Ct. at 2130. It is clear the ambiguity issue on which *Doyle* turned does not arise in this setting. Impeachment questioning is acceptable here because it "follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial." *Id.* 447 U.S. at 238, 100 S.Ct. at 2129.

> "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury.... Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process."

*Id.* at 237–38, 100 S.Ct. at 2129 (quoting *Harris v. New York*, 401 U.S. 222, 225, 91 S.Ct. 643, 645–46, 28 L.Ed.2d 1 (1971)). "Once a defendant decides to testify, '[t]he interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination.'" *Id.* 447 U.S. at 238, 100 S.Ct. at 2129 (quoting *Brown v. United States*, 356 U.S. 148, 156, 78 S.Ct. 622, 627, 2 L.Ed.2d 589 (1958)).

██ Hence, the prosecution may use a defendant's prearrest, pre-*Miranda* silence for impeachment purposes because, following defendant's waiver of his right to silence, justice demands the court's role in ascertaining truth outweigh the privilege against self-incrimination. Simply put, the courts cannot countenance perjury. However, the mere act of taking the stand does not independently make defendant's silence relevant. The prosecution can only question defendant regarding silence for impeachment purposes if, for example, the silence is inconsistent with the testimony the defendant offers at trial.

██ Subsequently, in *Fletcher v. Weir*, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) (per curiam), the Court allowed post-arrest silence to be used for impeachment purposes where *Miranda* warnings were not given. Thus, after *Doyle*, *Jenkins*, and *Fletcher*, use of privileged silence for impeachment purposes is constitutional unless the silence was potentially induced by the government's delivery of *Miranda* warnings.

██ The United States Court of Appeals for the Second Circuit has addressed the question before us. In *United States v. Caro*, 637 F.2d 869 (2nd Cir.1981), the court indicated prearrest, pre-*Miranda* silence could not be admitted in the government's case in chief. In *Caro*, the defendant's luggage was searched at the border. Customs officials found counterfeit money hidden inside. In the government's case in chief, the customs officer testified the defendant said nothing when the money was found. The defendant later took the stand and denied any knowledge of the money. In dicta, the court noted it "found no decision permitting the use of silence, even the silence of a suspect who has been given no *Miranda* warnings and is entitled to none, as part of the Government's direct case." *Id.* at 876. The court was "not confident" the Supreme Court would allow evidence "that a suspect remained silent before he was arrested or taken into custody to be used in the Government's case in chief." *Id.*[8] *See also United States v. Blanton*,

---

by the Fifth Amendment. *Jenkins*, 447 U.S. at 236 n. 2, 100 S.Ct. at 2128 n. 2.

**8.** The Tenth Circuit, in a combined civil and criminal prosecution, may have reached a different conclusion. However, we do not find the opinion's reasoning persuasive and think it may conflict with dicta in *Doyle*. In *United States v. Harrold*, 796 F.2d 1275 (10th Cir.1986), *cert. denied, Harrold v. United States*, 479 U.S. 1037, 107 S.Ct. 892, 93 L.Ed.2d 844 (1987), the defendant was subject to both a civil and a criminal investigation by the IRS. Separate IRS agents conducted the investigations. At trial, the government elicited testimony from each that the defendant invoked his right to silence. The civil investigator did not read the defendant his *Miranda* rights before the defendant invoked them. The criminal investigator testified defendant refused to reply to some questions after being apprised of his rights. On appeal, the government conceded both sets of testimony were inappropriate and asserted a harmless error argument. The court, however, ruled that the civil investigator's testimony was proper.

730 F.2d 1425, 1433–44 (11th Cir.1984) (recognizing *Caro* reasoning but not reaching issue because any error was harmless); *United States v. Lewis*, 651 F.2d 1163, 1169 (6th Cir.1981) (holding post-*Miranda* prearrest silence inadmissible in government's case in chief).

Only one state court[9] has addressed the issue we face head on. In *State v. Fencl*, 109 Wis.2d 224, 325 N.W.2d 703 (1982), the Wisconsin Supreme Court held "the protections of the Fifth Amendment do extend to pre-*Miranda*, prearrest silence." *Id.* 325 N.W.2d at 710. In that case, the prosecutor, in opening and closing argument and through questioning of one witness, introduced evidence that the defendant had stated he wanted to speak to his lawyer prior to arrest or *Miranda* warnings. The court reasoned

> [t]he Fifth Amendment protects a person from compelled self-incrimination at all times, not just upon arrest or during a custodial interrogation. Any time an individual is questioned by the police, that individual is compelled to do one of two things—either speak or remain silent. If both a person's prearrest speech and silence may be used against that person, as the state suggests, that person has no choice that will prevent self-incrimination. This is a veritable "Catch-22." Thus the state's theory places an impermissible burden on the exercise of Fifth Amendment rights.[10]

*Id.* 325 N.W.2d at 711. The court, however, found the erroneous admission of evidence of the defendant's silence was harmless and affirmed his conviction. *Id.* at 712.

■ The contested portions of the stipulation in this case were used at trial in the prosecution's case in chief to infer defendant exhibited a consciousness of guilt. Merely because an individual does not need to be advised of his right to remain silent until he is subject to a custodial interrogation does not mean he should be penalized for invoking that right earlier. To hold differently would impermissibly burden Fifth Amendment protections for any individual who attempts to exercise them prior to a custodial interrogation. Such a rule would also encourage the authorities to refrain from issuing *Miranda* warnings as long as possible in an attempt to generate either inferential evidence of guilt from silence or an admission prior to custodial interrogation. Providing law enforcement an incentive to withhold *Miranda* warnings would be poor public policy and contrary to the spirit of Fifth Amendment jurisprudence.

■ Thus, we conclude admission of the portions of the stipulated testimony impli-

---

*Id.* at 1279. It reasoned he was conducting a civil investigation and had not given the defendant ary *Miranda* warnings. According to the court "a comment on a defendant's silence is error only when the defendant remained silent in reliance on government action, *i.e.*, a *Miranda* warning." *Id.* (citing *United States v. Massey*, 687 F.2d 1348, 1353 (10th Cir.1982)).

The authority the Tenth Circuit relied on, that arising in the *Doyle* and *Fletcher* line of cases, concerned the use of silence for purposes of impeachment. In that area, the interest in preventing perjury and furthering the truth-finding function of the courts after a defendant's waiver of his right to silence weighs heavily in favor of allowing the silence for impeachment, yet the ambiguity that arises following a defendant's receipt of *Miranda* warnings tips the scale in the other direction. The factors considered in an impeachment situation are not relevant in the inference of guilt setting. Further, the *Harrold* court implies Fifth Amendment protections do not exist in civil investigations. It is clear that this is not true. *See, e.g., Estelle v. Smith*, 451 U.S. 454, 462, 101 S.Ct. 1866, 1873, 68 L.Ed.2d 359 (1981) (recognizing Fifth Amendment protections are available regardless of type of proceeding).

9. At least two other courts have recognized the issue of the admissibility of prearrest, pre-*Miranda* silence in the prosecution's case in chief exists but have refused to reach the issue because they held any error to be harmless. *See Johnson v. United States*, 613 A.2d 1381, 1389–90 (D.C.App.1992); *People v. Hayes*, 139 Ill.2d 89, 151 Ill.Dec. 348, 564 N.E.2d 803 (1990), *cert. denied, Hayes v. Illinois*, —— U.S. ——, 111 S.Ct. 1601, 113 L.Ed.2d 664 (1991).

10. This analysis has been criticized by one commentator as incorrectly equating a requirement that a person make a difficult choice with government compulsion. *See* Barbara R. Snyder, *A Due Process Analysis of the Impeachment Use of Silence in Criminal Trials*, 29 Wm. & Mary L.Rev. 285, 312–18 (1988).

cating defendant's decision to remain silent, along with the prosecutor's cross examination of defendant and closing arguments based on that testimony, used to demonstrate defendant had a consciousness of guilt was error. Whether it was harmful error is analyzed in conjunction with the other errors in this case.

## III. HARMFULNESS OF ERRORS

 In summary, we conclude there were numerous errors in the trial of this case. They are: (1) the prosecutor's questions containing unsupported innuendo, (2) the prosecutor's request that defendant comment on the veracity of E.N. and his mother's testimony, (3) the prosecutor's misstatement of the evidence regarding the alleged lapsitting incident, (4) the prosecutor's misstatement of the evidence regarding the Rub–A–Dub Hot Tub business, (5) the prosecutor's statements directly contradicting the only testimony about the content of the conversation between defendant and E.N.'s mother, and (6) the admission of the statements in the stipulated testimony and arguments based thereon regarding defendant's neutrality after accusation and desire to consult counsel. Whether these errors can be classified as cumulatively harmful turns on whether the errors undermine our confidence in the verdict. *See State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993).

The conviction in this case is based almost entirely on the testimony of E.N. The numerous errors by the prosecutor all are attempts to bolster the credibility of E.N. and to attack the credibility of defendant. The unsupported innuendo in the prosecutor's question that defendant had expressed having inappropriate feelings for E.N. provided the jury a basis to impute motives to defendant that are not supported by any testimony. By asking the defendant to comment on the veracity of E.N. and his mother, the prosecution forced defendant into the position of assessing the credibility of sympathetic adverse witnesses. If a juror had reached a different conclusion as to the witnesses' credibility, defendant's speculation could cause the ju-

ror to become biased against defendant. The comment on the alleged lapsitting sexual contact could have caused the jurors to believe there was more evidence of guilt than had actually been introduced. The comments on the hot tub business could have caused the jury to give E.N.'s testimony greater credibility. E.N. had experienced other incidents of sexual abuse, but the evidence offered no other explanation for his knowledge of commercial hot tub establishments. The comments on E.N.'s mother's testimony improperly bolstered the prosecution's consciousness of guilt argument. These comments made defendant appear more aware of the factual allegations against him than the testimony disclosed. The admission of testimony regarding defendant's exercise of his constitutional right to remain silent provided improper support for the prosecution's consciousness of guilt theory and could have convinced the jury to convict.

While any one of these errors would in itself be harmless, their cumulative effect is not. The testimony in the case basically consisted of E.N.'s assertions and descriptions of sexual encounters and defendant's denial of those encounters. This case turned primarily on the jury's assessment of the credibility of E.N. versus the credibility of defendant. Because of the nature of the evidence of guilt and the number of serious errors, we find the errors cumulatively harmful and cannot say we have confidence in the verdict.

## CONCLUSION

In light of the numerous errors in the prosecution of this case, our confidence in the verdict is undermined. Thus, we reverse defendant's conviction.

JACKSON and RUSSON, JJ., concur.