2020 UT App 135

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
KRISTOPHER ALLEN ANDERSON,
Appellant.

Opinion
No. 20190235-CA
Filed October 1, 2020

Fifth District Court, St. George Department
The Honorable G. Michael Westfall
No. 161501206

Ronald J. Yengich, Attorney for Appellant

Sean D. Reyes and Christopher D. Ballard, Attorneys
for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which
JUDGES GREGORY K. ORME and JILL M. POHLMAN concurred.

HAGEN, Judge:

¶1    Kristopher Allen Anderson appeals his convictions for child sodomy and child sexual abuse. On appeal, he raises multiple issues, most of which were not preserved by his trial counsel. He argues that the State committed prosecutorial misconduct by eliciting prejudicial testimony regarding the impact of the abuse on the victim and by commenting on Anderson's failure to return a detective's phone calls. Further, Anderson argues that his trial counsel rendered ineffective assistance by providing the State with his psychosexual evaluation and by not objecting when the State used Anderson's statements to the evaluator for impeachment. He also argues that the district court plainly erred in allowing the impeachment or, at minimum, should have admitted the entirety of the

evaluation once the State "opened the door." He also alleges that his trial counsel was ineffective for commenting on a failed plea agreement and failing to advise him of the correct mandatory minimum sentence. Relatedly, he asserts that because he was not advised of the correct mandatory minimum sentence, the district court erred by denying his motion to arrest judgment. Because Anderson has not established any claims of ineffective assistance of counsel, plain error, or abuse of discretion, we affirm.

BACKGROUND[1]

¶2     Anderson, the victim's cousin, travelled from Idaho to visit the victim's family in St. George, Utah, on June 18, 2016. The victim's family did not know in advance that he was coming. When he arrived at their home unexpectedly, Anderson asked whether he could stay the night and whether he could bring beer to drink. The victim's mother and father agreed.

¶3     The victim and his family lived in a three-bedroom apartment. The victim's two older sisters, who were then ages thirteen and eleven, shared a bedroom. The victim, who was six years old at the time, typically slept in the same room as his nineteen-year-old brother. Anderson stayed the night, sleeping in the boys' bedroom. Anderson and the two boys stayed up late playing video games in the boys' room and did not go to sleep until after the victim's parents and two sisters were asleep. Anderson drank beer throughout the night.

¶4     The next morning, Anderson departed before the others awoke. When the mother awoke, she found the victim asleep next to her bed in a pile of laundry. After the mother left for

_____

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Jones*, 2020 UT App 31, n.1, 462 P.3d 372 (cleaned up).

work, the victim confided in one of his sisters that in the night, Anderson had pulled down the victim's pants and underwear and touched his penis and buttocks. The victim then confided in his father, telling him the same story.

¶5 After calling the victim's mother to tell her what had happened, the victim's father called Anderson and asked whether he had done what the victim said he did. Anderson responded that "he wasn't sure" and that "he was drunk and couldn't remember." The father testified that Anderson was "upset," and that he was "choked up, crying a little bit" during the phone call.

¶6 Later, the victim's mother also called Anderson. During the call, she asked if "he tried to put his penis in [the victim's] butt . . . and if he was fondling him." Anderson first denied that he had, but after the mother repeated her question, he responded, "[Y]es." She then said, "You know what I have to do, right?" to which he responded, "Yeah, I know." She told him that one of them needed to tell Anderson's mother, and Anderson stated that he would.

¶7 The victim's mother and father then took the victim to the police station to report the crimes. A detective interviewed the mother and father. The next day, the victim's parents took the victim and his two sisters to the Children's Justice Center. Because they were all home during the time of the abuse, each child was interviewed. The following month, the victim's parents took him to a pediatrician to be examined, but the examination did not lead to any specific findings.

¶8 As part of the investigation, a detective called Anderson to get more information. When Anderson did not answer, the detective left a voicemail. A few days later, Anderson called back and left a voicemail for the detective. The detective continued calling, but Anderson never returned the subsequent phone calls. In his testimony at trial, Anderson attempted to excuse his

failure to return the phone calls by explaining that he entered a sober living facility on June 22 and did not have access to his phone.

¶9 During trial, the victim testified that on the night of the abuse, he had slept on the floor in the boys' room, while Anderson and his brother slept on the bed. He testified that at some point during the night, while his brother was asleep, Anderson got down on the floor next to him and "pulled down [his] pants and then he pulled down [his] underwear and then [Anderson] started touching [his] privates." He testified that Anderson had also put "his wiener" on "his butt," was "wiggling" it, and then told him, "[D]on't tell." The victim testified about disclosing the abuse to his family the next day and later during his interview at the Children's Justice Center.

¶10 The State also presented testimony from the victim's parents, both sisters, and the brother. Among other things, each witness detailed changes in the victim's emotional wellbeing since the abuse had occurred. Specifically, they all noted that before the abuse, the victim had been a happy, normal child. However, family members testified that, since the incident, the victim had become depressed, scared, and anti-social. The mother noted that the victim became "angry, very emotional, very untrusting," and "would be very sick to his stomach" and "would wet himself . . . if he knew that he was in a position to where he had to talk to someone about [the abuse]." She also testified that the victim had "threatened to kill himself several times." The victim's parents both noted that the victim slept in their room almost every night after the incident; he had done so only rarely before. The victim began counseling to help with these issues. The mother also testified that they had gotten the victim a service dog.

¶11 Anderson testified at trial. He indicated that he drank "five or six beers" throughout the night and stayed up playing

video games with the victim's brother until he went to sleep at approximately 4:00 a.m. He testified that he slept between the victim and the brother on the bed, then awoke at 5:00 a.m., and left before the others had gotten up. Anderson also testified that he had been "terrified" by the phone calls from the victim's parents and had responded "no" when the mother asked him whether he had stuck "[his penis] in [the victim's] butt." He testified that when he responded to the mother's accusation by saying, "Yeah, okay," he was agreeing only to call his mother and get some help, such as "sober living." Anderson denied sexually abusing the victim.

¶12 The jury convicted Anderson on one count of child sodomy and on one count of child sexual abuse. He now appeals.

ISSUES AND STANDARDS OF REVIEW

¶13 On appeal, Anderson raises five grounds for reversal. He frames his first two arguments as claims of prosecutorial misconduct. He argues that the State engaged in prosecutorial misconduct, first, by eliciting prejudicial testimony about the long-term impact of Anderson's crimes on the victim and, second, by improperly commenting on Anderson's failure to return the detective's phone calls in violation of his Fifth Amendment right to remain silent. Because his claims are unpreserved, he argues that his counsel rendered constitutionally ineffective assistance by failing to object and that the district court plainly erred in failing to address these instances of alleged misconduct even in the absence of an objection. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (cleaned up). "The plain error standard of review requires an

appellant to show the existence of a harmful error that should have been obvious to the district court." *State v. Hansen*, 2020 UT App 17, ¶ 10, 460 P.3d 560 (cleaned up).

¶14 Third, Anderson argues that his counsel rendered ineffective assistance by providing the State with a copy of a psychosexual evaluation containing information that the State used to impeach Anderson on cross-examination. We review this ineffective assistance of counsel claim as a matter of law. *Carr*, 2014 UT App 227, ¶ 6. Anderson also argues that the district court plainly erred by allowing the State to impeach him with certain statements he made to the examining psychologist and that the district court should have allowed him to admit the remainder of the evaluation. If preserved, we review the district court's evidentiary rulings for an abuse of discretion. *State v. Cegers*, 2019 UT App 54, ¶ 17, 440 P.3d 924. Absent an objection, our review is limited to plain error. *Id.*

¶15 Fourth, Anderson argues that his trial counsel rendered ineffective assistance by improperly commenting on a failed plea agreement, thus implying to the jury that Anderson was guilty. Again, we determine as a matter of law whether a defendant was deprived of the effective assistance of counsel. *Carr*, 2014 UT App 227, ¶ 6.

¶16 Fifth, Anderson argues that his counsel provided ineffective assistance by not informing him of the correct mandatory minimum sentence for child sodomy during the plea negotiation phase. We review claims of ineffective assistance of counsel as a matter of law. *Id.* He also claims that the district court abused its discretion when it denied his motion to arrest judgment based on his allegation that he was improperly advised of the mandatory minimum sentence. We review the district court's denial of a motion to arrest judgment for an abuse of discretion, reviewing "the legal standards applied by the trial

court in denying such a motion for correctness." *State v. Squires*, 2019 UT App 113, ¶ 23, 446 P.3d 581 (cleaned up).[2]


ANALYSIS

¶17 Most of Anderson's challenges on appeal were not raised through a timely objection in the district court. "When an issue is not preserved in the trial court, but a party seeks to raise it on appeal, the party must establish the applicability of one of [the] exceptions [to preservation] to persuade an appellate court to reach that issue." *State v. Johnson*, 2017 UT 76, ¶ 19, 416 P.3d 443. These exceptions are plain error, ineffective assistance of counsel, and exceptional circumstances. *See id.* Represented by new counsel on appeal, Anderson argues both ineffective assistance of his trial counsel and plain error by the district court.

¶18 "To demonstrate ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient and that the deficient performance prejudiced the defense." *State v. Alires*, 2019 UT App 206, ¶ 16, 455 P.3d 636 (cleaned up); *see also Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Failure to prove either element defeats the ineffective

---

2. Anderson also claims that the cumulative impact of these alleged errors warrants a new trial. However, "under the cumulative error doctrine, we will reverse only if the cumulative effect of the several errors undermines our confidence that a fair trial was had. If the claims are found on appeal to not constitute error, or the errors are found to be so minor as to result in no harm, the doctrine will not be applied." *State v. Alfatlawi*, 2006 UT App 511, ¶ 52, 153 P.3d 804 (cleaned up). Here, Anderson has not established that any errors occurred or that any of the alleged errors resulted in prejudice. Therefore, the cumulative error doctrine does not apply.

assistance of counsel claim." *State v. Tapusoa*, 2020 UT App 92, ¶ 17, 467 P.3d 912.

¶19 Under the first prong of the test, "we apply the deficiency standard announced in *Strickland* and ask whether counsel's actions fell below an objective standard of reasonableness." *State v. Florez*, 2020 UT App 76, ¶ 41, 465 P.3d 307 (cleaned up); *see also State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871 (stating that courts "ask whether, in light of all the circumstances, the attorney performed in an objectively reasonable manner" (cleaned up)). If counsel undertook the complained-of action for a sound strategic purpose, then counsel did not perform deficiently. *See State v. Scott*, 2020 UT 13, ¶ 35, 462 P.3d 350. However, the "converse is not true." *Ray*, 2020 UT 12, ¶ 34. As our supreme court has explained, "even where a court cannot conceive of a sound strategic reason for counsel's challenged conduct, it does not automatically follow that counsel was deficient." *Scott*, 2020 UT 13, ¶ 36. Instead, "the ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *Id.*

¶20 "In evaluating prejudice under the second part of the test, we assess whether there exists a reasonable probability that the case would have had a different outcome had trial counsel not performed deficiently." *Florez*, 2020 UT App 76, ¶ 43. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. To determine whether this standard has been met, we "consider the totality of the evidence before the judge or jury and then ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *State v. Garcia*, 2017 UT 53, ¶ 28, 424 P.3d 171 (cleaned up).

¶21 Alternatively, to establish plain error, "a defendant must show that the district court committed error, that the error

should have been obvious to the district court, and that the error prejudiced the defendant by creating a reasonable likelihood of a less favorable result." *State v. Cegers*, 2019 UT App 54, ¶ 22, 440 P.3d 924 (cleaned up). "If any one of these requirements is not met, plain error is not established." *State v. Diaz-Arevalo*, 2008 UT App 219, ¶ 13, 189 P.3d 85 (cleaned up).

¶22    With these standards in mind, we analyze each of Anderson's arguments in turn.

## I. Prosecutorial Misconduct Claims

¶23    Anderson contends that the State committed prosecutorial misconduct when the prosecutor (A) elicited testimony about the impact of Anderson's crimes on the victim and (B) commented on Anderson's failure to return the detective's phone calls. Although Anderson characterizes these claims as "prosecutorial misconduct," prosecutorial misconduct is not "a standalone basis for independent judicial review." *State v. Hummel*, 2017 UT 19, ¶ 111, 393 P.3d 314. When a defendant raises a claim of prosecutorial misconduct on appeal, "the question for our review is not whether to question the prosecutor's actions." *Id.* ¶ 117. Instead, "[a]ppellate courts review the decisions of lower courts," not "the actions of [the prosecutor]—at least not directly." *Id.* ¶ 107. Therefore, when a defendant has raised an alleged prosecutorial misconduct issue below, we review the district court's ruling on that objection or motion. *Id.* ¶¶ 106–07. On the other hand, when a defendant fails to raise the issue before the district court, "the law of preservation controls" and we review the issue "under established exceptions to the law of preservation"—namely, plain error, exceptional circumstances, or ineffective assistance of counsel. *Id.* ¶ 111.

¶24    Here, Anderson has argued these issues under both the plain-error and ineffective-assistance-of-counsel exceptions. Accordingly, "our disposition turns on whether the trial court plainly erred" by not intervening sua sponte or whether trial

counsel "rendered ineffective assistance" in failing to object, move for a mistrial, or seek another appropriate remedy. *State v. Bond*, 2015 UT 88, ¶ 30, 361 P.3d 104.

A.    Victim Impact Evidence

¶25    Anderson first claims that the prosecution elicited unfairly prejudicial testimony from the victim and his family regarding the impact the abuse had on the victim and that the prosecutor unfairly emphasized that testimony during closing arguments. Specifically, Anderson argues that the "evidence served no probative value, but served only to appeal to the jury's emotions and solicit an inappropriate emotion[al] response from the jury." The challenged evidence includes testimony from the father, mother, and siblings about the victim's behavioral changes since the abuse, how the family has helped him—such as providing a service dog and taking him to therapy—and instances of the victim talking about suicide.

¶26    We disagree with Anderson's assertion that the behavioral-change evidence had no probative value. The central issue at trial was whether the abuse ever happened. Changes in a victim's behavior, emotional health, and lifestyle can be circumstantial evidence that the alleged act occurred.[3] For example, in *State v. Cosey*, 873 P.2d 1177 (Utah Ct. App. 1994), a rape case, the district court admitted testimony from the victim's mother concerning the victim's behavior during the two weeks following the rape. *Id.* at 1181. The defendant claimed that the

---

3. When the State asked questions that were not probative of whether the crimes occurred—such as what the family had done to try to help the victim and the role of the service dog—trial counsel did object. Those objections were overruled, but Anderson has not challenged those evidentiary rulings on appeal.

testimony "was irrelevant to the central issue of whether the victim had consented" and that it should have been barred by rule 403 of the Utah Rules of Evidence because it was significantly more prejudicial than probative. *Id.* However, the State argued that it was relevant to prove the victim had suffered a traumatic experience. *Id.* This court held that the testimony was relevant circumstantial evidence that a traumatic experience had occurred and that "[a]ny doubts raised by the defense concerning whether or not the incident caused the change concern[ed] the *weight* that should be afforded the evidence, not its *admissibility*." *Id.* at 1182 (emphasis added). Similarly, the testimony elicited from the victim's family members in this case provided circumstantial evidence to corroborate the victim's testimony that the abuse occurred. Trial counsel's choice to forgo objecting to this testimony was not unreasonable where the evidence was probative to the central question at trial.

¶27 On appeal, Anderson suggests that the victim impact evidence was improper because it was not limited to the immediate aftermath of the abuse. Even assuming that objections regarding the relevant timeframe might have succeeded in narrowing the scope of the testimony, the decision to forgo such objections did not fall below an objective standard of reasonableness. Trial counsel is not required to make every objection that may have merit but can instead pick and choose. *See State v. Hart*, 2020 UT App 25, ¶ 29, 460 P.3d 604 ("But just because counsel *can* make an objection does not mean counsel *must* make an objection to avoid rendering ineffective assistance. Legal objections are an inherently strategic business."). In addition, trial counsel had a legitimate strategic basis for not objecting to evidence concerning the long-term impact of the alleged abuse on the victim. Trial counsel cast doubt on the veracity of the victim's claims generally by presenting evidence suggesting that at the time of trial, the victim was well-adjusted and not suffering from any trauma. For instance, trial counsel elicited testimony from the victim that he "had so much fun stuff

that has happened so [he] forgot about [the abuse]" and that he has a hard time remembering the abuse "because it was a long time ago, and [he has] so much happy stuff now." Where there is a reasonable strategic basis for forgoing an objection, we will not find deficient performance. *See State v. Scott*, 2020 UT 13, ¶ 35, 462 P.3d 350. Because trial counsel's actions were not objectively unreasonable, Anderson cannot demonstrate that he received ineffective assistance in this regard.

¶28   Anderson also takes issue with the following statement made by the prosecutor during closing argument:

> You saw the effects. All the children, including the parents, when they talked about the effects [on the victim], they talked about how he sleeps with his mom and dad, about how his anger -- he didn't want to go to school, didn't want to go to counseling, moody. They talked about the times when he had explosive diarrhea, wetting his pants, locking the doors at night. All these effects. The one that gets me, he talks about hurting himself. This six -- eight-year-old boy wants to hurt himself after going through so much trauma. He did not ask for this to happen to him.

Anderson argues that the prosecutor did not rely on the victim impact evidence to show that the crime occurred, but rather to play to the jury's sympathies. Relying on *State v. Campos*, 2013 UT App 213, 309 P.3d 1160, he argues that the State's closing argument "essentially asked the jury to consider the impact, or the effect, the abuse had on the child in determining guilt, instead of whether the elements of the offenses had been proven."

¶29   This case is readily distinguishable from *Campos*. In *Campos*, this court determined that the State had committed prosecutorial misconduct when, during closing remarks, the

prosecutor stated, "[W]hen you commit a crime like this, when you gun down your fellow neighbor in the most tragic of ways, stealing from him his ability to run, his ability to bike, his ability to walk his daughter down the aisle, when you do something like that on the streets of our community then you should be held accountable." *Id.* ¶ 48 (cleaned up). This court noted that a prosecutor is prohibited from "asking jurors to put themselves in the victim's place," suggesting that "the jury has a duty to protect the victim," or "referenc[ing] the jury's societal obligation" by asking the jury to "base its decision on the impact of the verdict on society and the criminal justice system rather than the facts of the case." *Id.* ¶ 51 (cleaned up). Importantly, the statements made in *Campos* were irrelevant to whether the defendant committed the crime.

¶30 In contrast to the remarks in *Campos*, here, the prosecutor's reference during closing argument to the victim's behavioral changes did not suggest "to the jury that it should find [Anderson] guilty out of vengeance or sympathy for the victim rather than based on what the facts and the law required." *See id.* ¶ 52. Instead, the prosecutor suggested that the effects listed were indicative of trauma and constituted circumstantial evidence corroborating the victim's testimony that the abuse occurred. This argument supported a verdict based not on sympathy but on evidence that proved the elements of the crime.

¶31 Anderson has also not shown that the district court plainly erred by allowing evidence and argument on victim impact. In our adversarial system, district courts should be circumspect about interfering in the parties' strategic decision-making regarding the admission of evidence. Our supreme court has stated that a "district court is not required to constantly survey or second-guess a nonobjecting party's best interests or trial strategy and is not expected to intervene in the proceedings unless the evidence would serve no conceivable strategic

purpose." *State v. Bedell*, 2014 UT 1, ¶ 26, 322 P.3d 697 (cleaned up). Here, neither the evidence nor the prosecutor's statements were so unduly prejudicial that the district court was required to intervene to preserve the integrity of the trial.

B.      Comment on Anderson's Silence

¶32     Anderson further argues that "the State engaged in prosecutorial misconduct when it solicited testimony from the detective that Anderson did not return his phone calls, improperly commenting on Anderson's right to remain silent." The State elicited testimony from the detective assigned to the case that he was never able to reach Anderson by phone to speak about the incident. The detective did acknowledge that Anderson had called him back at one point and left a voicemail. But, the detective stated that he tried contacting Anderson again, and Anderson "never did return [his] phone calls." During closing argument, the State referenced this again, stating:

> Then the detective, he called numerous times. Never did he – and then on a – on Monday, he called him back on Monday, said, "Hey, let me know." He never returned his phone call. The defense argued that why would somebody, you know, want to call and proclaim their innocence? If you are being accused of molesting a child, you better believe you would let everybody know this did not happen, "I did not do this," but nothing. Nothing.

¶33     Anderson argues that the detective's testimony and the prosecutor's comments violated his Fifth Amendment right to remain silent. *See* U.S. Const. amd. V. In support of this argument, he relies on this court's decisions in *State v. Palmer*, 860 P.2d 339 (Utah Ct. App. 1993), and *State v. Gallup*, 2011 UT App 422, 267 P.3d 289. Anderson appears to contend that, in light of *Palmer* and *Gallup*, the claimed error should have been

obvious to both his counsel and the district court, supporting his claims of deficient performance and plain error. However, in his opening brief, Anderson does not address the impact of the United States Supreme Court's subsequent decision in *Salinas v. Texas*, 570 U.S. 178 (2013) (plurality opinion), and whether defendants who have not received *Miranda* warnings must expressly invoke their right to remain silent to claim the protection of the Fifth Amendment at trial.

¶34   This court first considered whether a defendant's pre-arrest and pre-*Miranda* silence could be used against that person to prove consciousness of guilt in *Palmer*. The *Palmer* court noted that in *Doyle v. Ohio*, 426 U.S. 610 (1976), the United States Supreme Court had held that "a prosecutor's attempt to impeach a defendant's testimony by questioning him about his silence following arrest and receipt of *Miranda* warnings violated due process." *Palmer*, 860 P.2d at 347. In contrast, where no *Miranda* warnings preceded the defendant's silence, the Supreme Court had held that the State could constitutionally use the defendant's silence to impeach his exculpatory testimony at trial. *Id.* (citing *Jenkins v. Anderson*, 447 U.S. 231 (1980) (pre-arrest silence), and *Fletcher v. Weir*, 455 U.S. 603 (1982) (per curiam) (post-arrest silence)). In other words, before *Palmer*, it was already well-established that the use of a suspect's silence "for impeachment purposes is constitutional unless the silence was potentially induced by the government's delivery of *Miranda* warnings." *Id.* at 348. But the Supreme Court had not yet addressed whether a defendant's pre-*Miranda* silence could be used by the State in its case-in-chief.

¶35   The *Palmer* court held that the State may not introduce evidence in its case-in-chief that a defendant invoked his right to remain silent prior to the receipt of *Miranda* warnings. *Id.* at 349–50. The court reasoned that just "because an individual does not need to be advised of his right to remain silent until he is subject to a custodial interrogation does not mean he should be

penalized for invoking that right earlier." *Id.* at 349. The court also expressed concern that allowing such evidence would incentivize law enforcement to withhold *Miranda* warnings and would run contrary to "public policy" and "the spirit of Fifth Amendment jurisprudence." *Id.* The court did not address whether the defendant had expressly invoked his rights when he stated that "he just wanted to get some advice" before speaking to the police or whether his silence alone would have been sufficient to trigger the protection of the Fifth Amendment. *Id.* at 346.

¶36 But later, in *Gallup*, the defendant made no statement that could be construed as invoking his Fifth Amendment right to remain silent. 2011 UT App 422, ¶ 4. The State admitted evidence in its case-in-chief that the defendant said nothing and simply hung up the phone when the investigating officer called to speak with him. *Id.* ¶ 6. The defendant argued that he had exercised his right against self-incrimination by hanging up the phone and that the State's reference to his silence violated the Fifth Amendment. *Id.* ¶ 13.

¶37 The *Gallup* court agreed that "the trial court's admission of the silence evidence was error," *id.* ¶ 18, but declined to reach the State's argument that Gallup could not establish a Fifth Amendment violation because he did not expressly exercise the privilege against self-incrimination. *Id.* ¶ 18 n.4. In making this argument, the State relied on *Berghuis v. Thompkins*, 560 U.S. 370 (2010), in which the United States Supreme Court held that an in-custody defendant must "unambiguously" invoke the privilege to end an interrogation and cannot do so by simply remaining silent. *Id.* at 381. The majority noted that "Utah courts have yet to address the import of *Berghuis*, and [declined] to use [Gallup's] case as an opportunity to do so." *Gallup*, 2011 UT App 422, ¶ 18 n.4. The concurring opinion would have rejected the State's argument outright because *Berghuis* addressed only the issue of "what a custodial suspect must do to end an

interrogation" and did not speak to whether a noncustodial suspect must unambiguously invoke his Fifth Amendment right to remain silent. *Id.* ¶ 33 (Voros, J., concurring).

¶38 Two years later, the United States Supreme Court squarely addressed whether a noncustodial defendant's pre-*Miranda* silence is enough to invoke his Fifth Amendment protection. In *Salinas v. Texas*, 570 U.S. 178 (2013) (plurality opinion), the defendant had been called to the police station to be interviewed and to submit his shotgun for ballistics testing as part of a murder investigation. *Id.* at 182. An officer interviewed Salinas without reading him his *Miranda* warnings. *Id.* When the officer asked him whether the shells recovered from the murder scene would match his shotgun, Salinas remained silent and "looked down at the floor, shuffled his feet, bit his bottom lip, clenched his hands in his lap, and began to tighten up." *Id.* (cleaned up). After a short period of silence, the officer moved on and continued questioning Salinas. *Id.* At trial, the prosecutor used Salinas's silence and nervous behavior as evidence of guilt. *Id.*

¶39 In a plurality decision, the Supreme Court held that the prosecution's use of Salinas's pre-arrest, pre-*Miranda* silence in its case-in-chief was permissible, because Salinas had failed to expressly invoke his privilege against self-incrimination. *Id.* at 183. The plurality based its decision on long-standing precedent that this Fifth Amendment right must be unambiguously invoked. *Id.* "To prevent the privilege from shielding information not properly within its scope, we have long held that a witness who desires the protection of the privilege must claim it at the time he relies on it." *Id.* (cleaned up). "A witness does not expressly invoke the privilege by standing mute." *Id.* at 187. The plurality explained that the Fifth Amendment privilege, which must be expressly invoked, is distinct from the due process violation at issue in *Doyle*. *Id.* at 188 n.3. Although "*due process* prohibits prosecutors from pointing to the fact that a

defendant was silent after he heard *Miranda* warnings, . . . that rule does not apply where a suspect has not received the warnings' implicit promise that any silence will not be used against him." *Id.* (cleaned up); *see also State v. McCallie*, 2016 UT App 4, ¶ 25, 369 P.3d 103 (explaining that *Salinas* did not "abandon or narrow" *Doyle*). Because Salinas did not invoke the privilege during his interview, the prosecution did not violate the Fifth Amendment by using his silence in its case-in-chief.

¶40    Although the plurality opinion only garnered three votes, the two-member concurrence did not quibble with the proposition that suspects must unambiguously invoke their privilege to remain silent. Instead, the concurring justices would have gone further to hold that, even if Salinas had expressly invoked the privilege, the State's use of his precustodial silence would not violate the Fifth Amendment. *Salinas*, 570 U.S. at 192 (Thomas, J., concurring). "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977). "Because the circumstances in which the plurality opinion deemed prearrest silence to be admissible—i.e., when the defendant has not expressly invoked the privilege—is a logical subset of the concurring opinion's view that prearrest silence is admissible regardless of whether the defendant invoked the privilege, the rule set forth in the plurality opinion states the holding of the court." *People v. Tom*, 331 P.3d 303, 313 (Cal. 2014); *see also* Ian C. Kerr, Note, *Beyond* Salinas v. Texas*: Why an Express Invocation Requirement Should Not Apply to Postarrest Silence*, 116 Colum. L. Rev. 489, 532 (2016) (citing authority for the proposition that the *Salinas* plurality is the controlling opinion).

¶41    The State argues that, at minimum, "competent counsel could conclude that *Salinas* overruled *Palmer* and *Gallup*."

Because neither this court nor the Utah Supreme Court has squarely addressed the impact of *Salinas* on our precedent, we agree that counsel could reasonably reach this conclusion.[4] Where Anderson never expressly invoked his Fifth Amendment right as required by *Salinas*, it was not objectively unreasonable for his trial counsel to forgo an objection to the State's use of his pre-arrest silence.

¶42　Anderson argues that this case is distinguishable from *Salinas* because, under the unique facts of this case, he never had the opportunity to affirmatively invoke his right to remain silent. However, Anderson offers no legal support for the proposition that the right is self-executing under such circumstances. In any event, trial counsel's failure to make this argument did not rise to the level of deficient performance. *See State v. Reigelsperger*, 2017 UT App 101, ¶ 92, 400 P.3d 1127 (noting that counsel is not required to "make every novel argument new counsel may later derive and assert for the first time on appeal" in order to provide reasonably effective assistance). In light of *Salinas*, competent counsel could reasonably conclude that any objection to the

---

4. In a recent case where a defendant declined to sit for a pre-arrest police interview, this court cited *Palmer* and *Gallup* for the proposition "that evidence of a defendant's pre-arrest silence may not be used at trial 'to infer [that the] defendant exhibited a consciousness of guilt.'" *State v. Popp*, 2019 UT App 173, ¶ 46, 453 P.3d 657 (quoting *State v. Palmer*, 860 P.2d at 349 (Utah Ct. App. 1993)). However, the *Popp* court did not address the impact of *Salinas*, nor did it consider whether the defendant's failure to expressly invoke the privilege was fatal to his argument that the State's use of his pre-arrest silence violated the Fifth Amendment. Instead, the *Popp* court resolved the issue on the basis that the State had not used the evidence "in a way that 'raises the inference that silence equals guilt.'" *Id.* ¶¶ 46–47 (cleaned up).

prosecutor's comments would have been futile. *See State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546 ("Failure to raise futile objections does not constitute ineffective assistance of counsel.").

¶43 Similarly, the district court had no duty to intervene sua sponte. Under the plain error standard of review, Anderson must demonstrate not only that an error exists, but also that the error "should have been obvious to the district court." *Veracity Networks LLC v. MCG S. LLC*, 2019 UT App 53, ¶ 27, 440 P.3d 906 (cleaned up). "To show that the error complained of should have been obvious to the district court, an appellant must show that the law governing the error was clear at the time the alleged error was made." *Id.* (cleaned up). As explained above, the law governing the use of pre-arrest silence was far from clear. Any error in allowing the use of Anderson's silence would not have been obvious to the district court. Thus, Anderson has not established plain error.

¶44 Because he has not established either ineffective assistance of counsel or plain error, both of Anderson's unpreserved "prosecutorial misconduct" claims fail.

## II. Psychosexual Evaluation

¶45 Anderson next contends that his trial counsel provided ineffective assistance by providing a psychosexual evaluation to the State without an agreement limiting its use and by failing to object to the State's use of the evaluation to impeach Anderson on cross-examination. He further argues that the State's use of Anderson's statements to the evaluator opened the door to his use of the entire evaluation.

¶46 Prior to the start of trial, Anderson notified the court that he intended to call the psychologist who conducted the evaluation as an expert witness and provided the State with the expert's written report. Trial counsel sought to admit this evidence to show Anderson's "propensity for physiological

response to age-appropriate female sexual interactions" and his "lack of pedophilic interests."

¶47    In response to Anderson's notice of expert testimony, the State moved to "exclude [the expert's] testimony and the [report] from consideration by the jury at trial as inadmissible under Utah Rules of Evidence 401, 403 and 702." The State provided the court with a copy of the report. Over Anderson's objection, the court granted the State's motion, finding that the expert's opinion as to Anderson's non-pedophilia was unreliable, and therefore excluded the evidence under rule 702 of the Utah Rules of Evidence.

¶48    However, during trial, the State impeached Anderson with statements he made during the evaluation that had been included in the expert's report. Trial counsel did not object. On re-direct, trial counsel referred to the evaluation, and the State objected. Trial counsel argued that the State had opened the door by using the report during cross-examination. The court rejected Anderson's argument and sustained the objection.

¶49    Anderson argues that his counsel was ineffective for providing the State with a copy of the report because the "evaluation was not favorable for [him] under any reasonable reading." Specifically, Anderson contends that the evaluation was not favorable to him because it contained (1) Anderson's "sexual risk classification and his screening scale for pedophilia," (2) "inculpatory admissions regarding [Anderson's] criminal conduct," and (3) "a version of the facts that differed from Anderson's testimony." Anderson argues that "no reasonable attorney would have disclosed the confidential evaluation to the prosecution."

¶50    As to the first two categories of potentially damaging information, Anderson cannot establish prejudice as a result of the disclosure. The State never introduced Anderson's sexual risk classification, his screening scale for pedophilia, or his

admissions to other crimes. Consequently, even assuming that divulging such information to the State fell below an objective standard of reasonable performance, the disclosure did not prejudice Anderson.

¶51 The State's use of the evaluation was limited to the third category of information that Anderson identifies as unfavorable. Specifically, the State questioned Anderson about his own inconsistent statements to the psychologist about the details of the night he spent at the victim's house. Those statements were limited to such facts as the amount of alcohol Anderson drank, the time he went to sleep, and the time he awoke. None of those statements was obviously inculpatory. They became favorable to the State only after Anderson testified in an inconsistent manner at trial. At the time the report was disclosed, reasonable trial counsel would not have considered Anderson's statements to be damaging information. A reasonably competent attorney would not necessarily anticipate that Anderson would change his story on the stand, thereby opening himself to impeachment based on his prior statements to the psychologist.

¶52 Further, trial counsel did not perform deficiently in not objecting to the State's use of Anderson's prior statements found in the report. "The failure of counsel to make motions or objections which would be futile if raised does not constitute ineffective assistance." *State v. Alzaga*, 2015 UT App 133, ¶ 73, 352 P.3d 107 (cleaned up). Here, any objection would have been futile because Anderson's prior statements were admissible. A party may cross-examine a witness with that witness's prior inconsistent statements. *See* Utah R. Evid. 613(b). Moreover, Anderson's statements were not hearsay because they were statements of a party opponent. *See id.* R. 801(d)(2). In addition, the court's prior ruling excluding the expert's testimony did not preclude the State from using Anderson's statements referenced in the report. The court excluded the expert opinion because it was unreliable under rule 702 of the Utah Rules of Evidence. But

that ruling had no bearing on whether the State could use Anderson's own statements, as opposed to the expert's conclusions and opinions. Trial counsel did not perform deficiently in forgoing a futile objection, and the trial court did not commit plain error by failing to intervene.

¶53   Similarly, the district court did not abuse its discretion in refusing to admit the report after the State used it to cross-examine Anderson. Anderson claimed that the State's use of the evaluation opened the door to its contents, and therefore trial counsel "should have been able to then use the remainder of the evaluation to his advantage." However, the State did not open the door to the expert's opinions, which the court had already deemed unreliable. During its cross-examination, the State did not reference any of the expert's tests or conclusions. In fact, the State gave very little detail as to the purpose of Anderson's conversation with the psychologist. The district court did not abuse its discretion in determining that the State's use of the report for the limited purpose of highlighting Anderson's prior inconsistent statements did not open the door to the introduction of the entire report.[5]

### III. Comments on Failed Plea Agreement

¶54   Anderson next argues that his trial counsel provided ineffective assistance when he "revealed to the jurors in opening statements that he had tried to resolve the case, but could not," which "implied to the jury that Anderson was guilty, since his counsel had tried to resolve the case." Anderson claims that counsel's statements "alerted the jury to the inadmissible fact

---

5. Anderson also argues on appeal that the entirety of the report was admissible under the rule of completeness. *See* Utah R. Evid. 106. However, Anderson's trial counsel did not preserve this issue, and we therefore decline to address it on appeal.

that Anderson had been attempting to resolve the case, but was unsuccessful," and that "the comment had no conceivable tactical basis but served only to unfairly prejudice Anderson."

¶55 The absence of a sound strategic reason for counsel's act or omission does not automatically establish deficient performance. *See State v. Ray*, 2020 UT 12, ¶ 36, 469 P.3d 871. But, more fundamentally, we disagree with Anderson's characterization of his counsel's comments. During his opening statement, counsel made the following remarks:

> So what we're going to be looking at over the next couple of days is whether a crime was committed, and if so did [Anderson] commit it. Now, he has heard these allegations and he has said, "I didn't do it. I am not guilty. I didn't do this thing," and he has persisted in that declaration of his innocence, which is his right under the law. We haven't been able to resolve that issue, and we've tried. All attorneys try to resolve their cases in a way that both sides are happy with it, but in these kind of cases sometimes there's just no way around it. Sometimes there's just no other way than to say, "Look, I'm – I'm never going to say I did something I didn't do. I don't care how many times you tell me I've done it, I'm not going to admit it because I'm innocent." That's when we have to have you, our fellow citizens come in and hear the evidence on both sides as to what people saw, what people heard, and what people said or did, and then you make your decision, a factual decision as to whether a crime has been committed or not.

¶56 In context, trial counsel did not suggest in opening statement that Anderson was guilty. There was no reference to

plea negotiations, a potential guilty plea, or the possibility that Anderson was guilty but merely exercising his constitutional right to a trial. To the contrary, counsel's statement that Anderson was "never going to say I did something I didn't do" was a strong denial of guilt. Including such remarks in the opening statement was neither objectively deficient nor prejudicial. Therefore, Anderson has not established ineffective assistance of counsel.

## IV. Incorrect Mandatory Minimum Sentence

¶57    Lastly, Anderson argues that the court abused its discretion when it denied his motion to arrest judgment regarding the child sodomy count, because he was not properly notified of the mandatory minimum sentence for that count. When Anderson was first charged in 2016, the initial information stated that the child sodomy count was punishable "by imprisonment for an indeterminate term of not less than 6, 10, or 15 years, and which may be for life." He was also charged with two counts of child sexual abuse. Following the preliminary hearing, the State filed an amended information, which eliminated one count of child sexual abuse. Again, the amended information stated that the child sodomy count carried a 6, 10, or 15-year minimum mandatory. However, the minimum mandatory for child sodomy is 25 years. Thus, both informations incorrectly stated the mandatory minimum sentence.

¶58    On the first day of trial, before the jury was empaneled, the State made a record that it had offered a plea deal to Anderson and that he had rejected it. The State's plea offer would have allowed Anderson to plead guilty to two counts of sexual abuse of a child, both second-degree felonies. The State incorrectly noted, "As you – or as the Court's well aware, sodomy on a child as a first-degree felony is a mandatory prison [sentence of] 15 years to life if convicted." The court then confirmed with trial counsel that Anderson had rejected the

offer. Trial counsel stated, "Yes, your Honor, with one correction. It's my understanding that sodomy on a child is 25 to life mandatory, but be that as it may, I have communicated that offer to him and he has . . . declined that offer, and he wants to go to trial." The court asked Anderson whether that was correct, to which Anderson replied, "[Y]es sir."

¶59 Following trial, Anderson obtained new counsel, who discovered the discrepancy in the applicable mandatory minimum stated in the amended information and moved for an order arresting judgment as to his child sodomy conviction. The court denied the motion, acknowledging that a mistake had been made, but finding that Anderson had been given adequate notice as to the correct mandatory minimum before trial began and "had an opportunity at that point to make some point, make an issue of it." Now, Anderson contends that the court abused its discretion when it denied the motion to arrest judgment, and that trial counsel was ineffective during the plea-bargaining process.

¶60 In *Lafler v. Cooper*, 566 U.S. 156 (2012), the United States Supreme Court held that the Sixth Amendment right to effective assistance of counsel extends to the plea negotiation phase and that "if a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it." *Id.* at 168. "If that right is denied, prejudice can be shown if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence." *Id.*

¶61 To establish ineffective assistance in the plea negotiation context, Anderson must first establish "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 163 (cleaned up); *see also Strickland v. Washington*, 466 U.S. 668, 688 (1984). He then must demonstrate that "the outcome of the plea process would have been different

with competent advice." *Lafler*, 566 U.S. at 163. Here, this requires a showing that (1) "but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances)," (2) that "the court would have accepted its terms," and (3) "that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Id.* at 164.

¶62 Anderson cannot make these showings. Anderson has not pointed to any evidence to suggest that trial counsel misinformed him of the mandatory minimum sentence he faced if he did not accept the plea offer. Indeed, the information found in the record suggests the opposite. As the district court noted, trial counsel immediately corrected the State's misstatement of the mandatory minimum when making a record of Anderson's rejection of the plea offer. Although Anderson is correct that both the State and the court stated the wrong mandatory minimum, there is nothing in the record to suggest that Anderson's counsel was likewise misinformed and advised him of the incorrect sentence. Therefore, he cannot establish that his counsel's assistance during the plea negotiation phase fell below an objective standard of reasonableness.

¶63 The district court similarly did not abuse its discretion when it denied Anderson's motion to arrest judgment. In his motion to arrest judgment, Anderson argued that his due process rights had been violated because he was not given adequate notice of the correct mandatory minimum sentence. The court, in its oral ruling on the motion, made a factual finding that although a mistake had been made in the original and amended informations, Anderson had received notice of the correct mandatory minimum prior to trial. A "district court's factual findings are reviewed deferentially under the clearly

erroneous standard." *Plaia v. Plaia*, 2019 UT App 130, ¶ 10, 450 P.3d 80 (cleaned up). Anderson has not challenged that factual finding—and for good reason, given the colloquy that occurred before trial. In light of that factual finding, the district court did not abuse its discretion when it denied Anderson's motion to arrest judgment.

## CONCLUSION

¶64 Anderson has not demonstrated that his counsel performed deficiently or that the district court plainly erred or exceeded its discretion. Therefore, we affirm.

_____